**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **RHODE ISLAND AIRPORT CORPORATION, INC.** | : | |
| **v.** | : | **C.A. No. 07-300-S** |
| **GENERAL STAR INDEMNITY COMPANY** | : | |

**STIPULATION OF UNDISPUTED FACTS**

The parties hereby stipulate that the following facts are not in dispute:

1. This case is an insurance coverage dispute between Plaintiff, Rhode Island Airport Corporation, Inc. ("RIAC"), the insured, and Defendant General Star Indemnity Company ("GSIC"), the insurer.

2. RIAC seeks a declaration that GSIC is required to defend and to indemnify it and Blue Skies Skydiving, Inc. ("BSSI") for any losses arising from a September 29, 2002 accident in which Suzanne Marie Costa was injured at the North Central Airport ("Airport") in Lincoln, Rhode Island.

3. Ms. Costa and her family have brought an action, *Suzanne Marie Costa*, *et al. v. Daniel King*, *et al.*, C.A. No. PC 05-0140, which is currently pending in the Rhode Island Superior Court for Providence County ("Costa Action").

4. GSIC has agreed to provide a defense to certain parties to the Costa Action (but not RIAC) under a reservation of its right to contest its duties to defend and/or indemnify.

**THE PARTIES IN EACH ACTION**

5. The Airport is owned by the State of Rhode Island. RIAC is a corporation organized under the laws of Rhode Island and has been granted a leasehold

interest for a term of 30 years pursuant to a July 1993 agreement with the State of Rhode Island. RIAC operates and manages the Airport under this agreement.

6. Hawthorne Aviation – Rhode Island, Inc. ("HARI") had contracted with RIAC to provide management services for the Airport during the relevant time period.

7. Blue Skies Skydiving, Inc., d/b/a Boston-Providence Skydiving Center ("BSSI") conducted skydiving operations at the Airport under written authorization provided by HARI. One condition of that authorization required BSSI to obtain "public liability insurance," with a bodily injury limit of $1,000,000, naming RIAC and HARI as additional insureds.

8. Robert Spencer was the President and sole shareholder of BSSI at the time of the accident.

9. BSSI also received authorization from New England Aviation, Inc. ("NEA") to conduct a skydiving operation on its leased space. That authorization is memorialized by an October 31, 1997 agreement which states that "I, Michael Bernier, President of [NEA], located at [the Airport], grant permission Mr. Robert Spencer to operate a skydiving operation from my business location."

**THE AIRPORT**

10. Attached as **Exhibit 1** is a map (to scale) of the relevant portion of the Airport property.

11. The landing area consisted of a grassy area to the south and east of Runway 5-23 as depicted on **Exhibit 1**, which also contains a hand-written sketch of the aircraft location. These markings were drawn by David Cloutier, an employee of RIAC, and should be understood as rough approximations of the landing area and aircraft location.

12. In September 2002, a chain rope divider surrounded the grassy landing area and separated the grassy area from the taxiways and the paved tarmac.

13. It was the routine practice of BSSI to distribute a document called “Drop Zone Rules” to its customers. Attached as **Exhibit 2** is an example of that document (not to scale), which depicts several landing areas. BSSI’s participants were expected to land in the various areas based upon their level of skill and experience.

14. Ms. Costa received and reviewed BSSI's Drop Zone Rules.

15. Ms. Costa did not receive or request clarification of the Drop Zone Rules.

16. RIAC did not designate the specific drop zone to be utilized by skydivers.

17. BSSI operated its skydiving business out of a portable trailer/office owned by BSSI which is located on the grounds of the Airport, in close proximity to the hangar leased to NEA, and is depicted on **Exhibit 1** at or near the circled #8.

18. The BSSI trailer is used by BSSI for storage, office space, and “ground school” training for skydivers, and was the only facility maintained and owned by BSSI at the Airport.

19. RIAC had no role in the operation of the "ground school," in the training of skydivers, or in the operation of BSSI's business.

20. The trailer is located on the portion of the Airport leased by RIAC to NEA.

**THE ACCIDENT**

21. During certain times on September 29, 2002, Suzanne Marie Costa was engaged in skydiving activities at the Airport.

22. Those skydiving activities were conducted by BSSI through its employees and agents.

23. During flight, Ms. Costa and several other skydivers exited a Cessna Grand Caravan 208B aircraft ("Jump Aircraft") and began their descent from an altitude of approximately 14,000 feet, after which the Jump Aircraft proceeded to land at the Airport.

24. At approximately 5,000 feet, Ms. Costa engaged her parachute and completed her descent "under canopy."

25. The Jump Aircraft landed prior to Ms. Costa's landing.

26. Upon landing, the Jump Aircraft proceeded to the designated boarding area selected by BSSI, with its engine running and its propeller rotating, in order that a group of passengers could board for the next skydiving event. (This practice is referred to as "hot loading.")

27. The "A/C" mark on **Exhibit 1** is an approximation of the location of the Jump Aircraft at the time of the accident.

28. The Jump Aircraft was located in the "tiedown area" which was leased from RIAC to NEA and used by BSSI.

29. As Ms. Costa approached the Jump Aircraft, it was oriented so that the tail was to her left and the propeller was to her right.

30. A bystander tackled Ms. Costa before her parachute became tangled in the Jump Aircraft's propeller.

31. Ms. Costa testified that she touched down moments *prior* to being tackled.

32. Witnesses Ken Thomas, John Martin, and Robert Gow testified that Ms. Costa touched down moments *after* being tackled.

33. Ms. Costa's parachute became entangled in the propeller.

34. Ms. Costa was dragged by her parachute into the rotating propeller.

35. Ms. Costa was pulled into the propeller and made between one and two revolutions around the propeller, suffering serious (but not fatal) injuries as a result.

36. Ms. Costa testified that "I don't believe that I would have been stuck in the propeller if it wasn't - wasn't for the parachute because I don't think anything would have dragged me in." (Costa Dep. 85:10-13.)

**THE COSTA LITIGATION**

37. On or about January 10, 2005, the Costa Action was filed. A true copy of the complaint in that action ("Costa Complaint") is attached as **Exhibit 3**.

38. Plaintiff Rhode Island Airport Corporation ("RIAC") was named as a defendant in the Costa Action. The Costa Complaint states that RIAC,

> as owner of the North Central Airport, owed a duty to Ms. Costa to, *inter alia*, design, manage, and operate the North Central Airport facility in a manner so as to ensure that persons using the facility in the exercise of due care, including Ms. Costa, did not come into contact with the rotating blades of airplane propellers while engaged in skydiving or other activities. Said duty includes, but is not limited to, the duty to exercise due care and skill in the provision of property and services, in the selection and supervision of its agents, employees, lessees and other third parties in lawful possession of the facility; in the entrustment of property and authority to its agents, employees, lessees and other third parties; and in the general operation and management of the North Central Airport.

(Costa Complaint ¶ 38, Ex. 3.)

39. It is also claimed that RIAC negligently failed to carry out the aforesaid duties and is therefore liable to the plaintiffs in the Costa Action for compensatory damages, interest, and costs. (Costa Complaint ¶ 39–40 & p. 11, Ex. 3.)

40. The Costa Action includes allegations sounding in negligence against BSSI for its alleged breach of duties to design, manage, and operate the BSSI facility in a manner so as to ensure that their customers, including Ms. Costa, did not come into contact with the rotating blades of airplane propellers while engaged in skydiving or other activities in the exercise of due care on the BSSI business premises. (Costa Complaint ¶ 30, Ex. 3). The Costa Action also alleges that BSSI failed to maintain a safe distance between the boarding site where airplanes would be parked while skydivers embarked on skydiving flights, and the designated skydiving area. (Costa Complaint ¶ 31, Ex. 3).

41. The Costa Action also includes allegations sounding in negligence against Daniel King arising from his piloting of the Jump Aircraft; against Robert Spencer based on his provision of skydiving services; against Kevin McCole as owner of the Jump Aircraft; against HARI arising from its status as manager and operator of the North Central Airport; against Piedmont Hawthorne Aviation, Inc. as parent corporation of HARI; and various other claims. (Costa Complaint, Ex. 3.)

42. RIAC has also brought a third-party complaint against NEA for indemnity and/or contribution arising from a lease agreement between those two parties.

**THE INSURANCE POLICY**

43. Defendant General Star Indemnity Corporation ("GSIC") issued a "Commercial General Liability" policy to BSSI ("Policy") which named RIAC as an additional insured, and which applies to the period of time during which the accident occurred.

44. No agents of RIAC were involved in the negotiations leading to the issuance of the Policy, which was the responsibility of BSSI to obtain.

45. True and accurate copies of various documents contained in the Policy are attached as **Exhibit 4**, which contains twenty pages.

46. **Exhibit 4** is divided into the following parts: (1) Common Policy Declarations (page 1); (2) Common General Liability Declarations (page 2); (3) Schedule of Forms and Endorsements (page 3); (4) Additional Insured (HARI.) (page 4); (5) Additional Insured (RIAC) (page 5); (6) Limitation of Coverage to Designated Premises or Project (page 6); (7) Exclusion – Designated Professional Services (page 7); (8) Combined Provisions Endorsement (pages 8–11); (9) Minimum Earned Premium (page 12); (10) Additional Insured (RIAC) (page 13, duplicate of page 5); (11) Insurance Binder (page 14); (12) Denial of Coverage (pages 15–20).

47. The Insurance Binder document, dated 3/27/02, states that "THIS BINDER IS A TEMPORARY INSURANCE CONTRACT. . ." which expires on April 26, 2002. It also provides that the "DESCRIPTION OF OPERATIONS/ VEHICLE/PROPERTY" is "PREMISES LIABILITY –OFFICE. NO COVERAGE INTENDED FOR ANY ACTUAL SKYDIVING OR RELATED OPERATIONS." (Policy 14.)

48. The Insurance Binder document was intended by the parties to memorialize the insurance contract upon agreement, and was in effect only until the complete Policy terms were transmitted to the insured, after which those terms superseded the Insurance Binder as the operative policy document.

49. The "Common Policy Declarations" document, which is signed and dated April 3, 2002, provides for "Commercial General Liability Coverage." (Policy 1.) The

"Commercial General Liability Declarations" document provides for liability limits of $1,000,000 per occurrence. (Policy 2.)

50. The "Denial of Coverage" document, dated February 18, 2005, accurately restates the text of certain policy provisions as described in the next two paragraphs. (Policy 15–20.)

51. Section I.A.1.a. of the Policy states that GSIC "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' . . . to which this insurance does not apply." (Policy 16.)

52. Section I.A.1.b. of the Policy states that "[t]his insurance applies to 'bodily injury' . . . only if" that bodily injury "takes place in the coverage territory." (Policy 16.)

53. The "Exclusion – Designated Professional Services" document states that "[w]ith respect to any professional services shown in the Schedule . . . . [t]his Insurance does not apply to 'bodily injury' . . . due to the rendering of or failure to render any professional service." The "Schedule" describes professional services as "AIRPORT/SKYDIVING AND RELATED SERVICES." (Policy 7.)

54. The "Limitation of Coverage to Designated Premises or Project" document states that "[t]his insurance applies only to 'bodily injury' . . . and medical expenses arising out of . . . [t]he ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises. . . ." The

Schedule is blank, so the designated premises are those premises defined "in the Declarations as applicable to this endorsement." (Policy 6.)

55. The "Commercial General Liability Declarations" document defines the "premises" as "6 Albion Road, Lincoln, RI 02865." The Location Classification is described as "BUILDINGS OR PREMISES–OFFICE–OTHER THAN – NOT FOR PROFIT." (Policy 2.)

56. The address of "6 Albion Road, Lincoln, RI 02865," referred at all times to the BSSI trailer which was located on the Airport's property.

57. The "Additional Insured – Mangers or Lessors of Premises" document applicable to RIAC provides a "Designation of Premises (Part Leased to You)" as "6 Albion Road, Lincoln, RI 02865." That document also states that "Section II [of the Policy] is amended to include as an Insured [RIAC] . . . but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you . . . ." The word "you" in the previous sentence means BSSI. (Policy 5.)

**PROCEDURAL POSTURE**

58. On or about July 6, 2007, RIAC brought the present action against GSIC in the Rhode Island Superior Court for Providence County.

59. GSIC then caused this action to be removed to the United States District Court for the District of Rhode Island.

60. The substantive law of Rhode Island applies to this diversity action.

PLAINTIFF,
RHODE ISLAND AIRPORT
CORPORATION, INC.
By Its Attorneys,

/s/ Lori Caron Silveira

Lori Caron Silveira, Esq. (#3576)
Adler Pollock & Sheehan
One Citizens Plaza, 8th Fl.
Providence, RI 02903-1345
(401) 274-7200 FAX (401) 751-0604
lsilveira@apslaw.com

/s/ Lev Kalman

Lev Kalman
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103

/s/ David Zeehandelaar

David Zeehandelaar
Blank Rome LLP
One Logan Square
Philadelphia, PA 19103
zeehandelaar@blankrome.com

DEFENDANT,
GENERAL STAR INDEMNITY
COMPANY
By Its Attorneys,

/s/ Dennis E. Carley

Dennis E. Carley, Esq. (#3002)
Roberts, Carroll, Feldstein & Peirce, Inc.
10 Weybosset Street, 8th Fl.
Providence, RI 02903
(401) 521-7000 FAX (401) 521-1328
decarley@rcfp.com

/s/ Daniel E. Burgoyne

Daniel E. Burgoyne (#7541)
Roberts, Carroll, Feldstein & Peirce, Inc.
10 Weybosset Street, 8th Fl.
Providence, RI 02903
(401) 521-7000 FAX (401) 521-1328
dburgoyne@rcfp.com

**CERTIFICATION**

The undersigned hereby certifies that a true copy of the within document was filed electronically with the Court, and notices of electronic filing were sent to the following counsel of record on **July 11, 2008**.

Lori Caron Silveira, Esq.
Adler Pollock & Sheehan
One Citizens Plaza, 8th Fl.
Providence, RI 02903-1345
lsilveira@apslaw.com

David N. Zeehandelaar
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
zeehandelaar@blankrome.com

and via First Class Mail to:

Lev Kalman, Esq.
Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998

/s/ Daniel E. Burgoyne

Exhibit List

1. Map of Airport.

2. “Drop Zone Rules” map.

3. Complaint, *Suzanne Marie Costa. et al. v. Daniel King, et al.*, C.A. No. 05-0140 (R.I. Super., Jan. 10, 2005).

4. Insurance Policy.