**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **RHODE ISLAND AIRPORT CORPORATION, INC.** | : | |
| | : | |
| **vs.** | : | **C. A. No. 07-300 S** |
| | : | |
| **GENERAL STAR INDEMNITY COMPANY** | : | |

**<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, Rhode Island Airport Corporation ("RIAC"), hereby moves for summary judgment pursuant to Fed. R. Civ. P. 56. In support of its Motion, RIAC relies upon the enclosed Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, supporting exhibits, and Stipulation of Undisputed Facts filed on July 11, 2008.

WHEREFORE, Plaintiff requests that its Motion be granted, and that this Court enter a judgment in its favor declaring that the Defendant, General Star Indemnity Company, is obligated to defend and indemnify RIAC in the underlying action, *Suzanne Marie Costa, et al. v. Daniel King, et al.* C.A. No. 05-0140 (R.I. Super, filed Jan. 10, 2005),
and granting the relief sought by Plaintiff in the Declaratory Judgment Complaint filed in this matter. Plaintiff requests that it be awarded its costs in this action and any other such relief that the Court deems appropriate.

PLAINTIFF, RHODE ISLAND AIRPORT CORPORATION.
By Its Attorneys,

/s/ Lori Caron Silveira
Lori Caron Silveira (#3576)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Telephone: (401) 274-7200
Fax: (401) 351-4607
E-Mail: lsilveira@apslaw.com

/s/ David N. Zeehandelaar
By: David N. Zeehandelaar
*Admitted pro hac vice*
BLANK ROME, LLP
One Logan Square
Philadelphia, PA 19103-6998

*Counsel for Plaintiff Rhode Island Airport Corporation*

**CERTIFICATION**

The undersigned hereby certifies that on the 13th day of August, 2008, a true copy of the within document was filed with the Court by electronic means (ECF), and notices of electronic filing were sent to the following counsel of record:

Dennis E. Carley, Esq.
Roberts, Carroll, Feldstein & Peirce, Inc.
Ten Weybosset Street
Providence, RI 02903

Daniel E. Burgoyne, Esq.
Roberts, Carroll, Feldstein & Peirce, Inc.
Ten Weybosset Street
Providence, RI 02903

/s/ Lori Caron Silveira

464745_1.DOC

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **RHODE ISLAND AIRPORT CORPORATION, INC.** | : | |
| | : | |
| **vs.** | : | **C. A. No. 07-300 S** |
| | : | |
| **GENERAL STAR INDEMNITY COMPANY** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This is an insurance coverage dispute in which the Plaintiff Rhode Island Airport Corporation ("RIAC") seeks a declaratory judgment that the Defendant is required to defend and indemnify it pursuant to a policy of insurance procured by Blue Skies Skydiving, Inc. ("BSSI") which named RIAC as an additional insured. The underlying incident that led to this declaratory judgment action involves serious injuries suffered by a skydiver named Suzanne Costa when she overshot a designated landing zone, her parachute collapsed into the moving propeller of a nearby airplane, and she was pulled by her parachute into the airplane propeller.

RIAC seeks a declaratory judgment that the Defendant, General Star Indemnity Company ("Genstar") is required to indemnify and defend it in the underlying litigation pending in the Superior Court of Rhode Island as more fully set forth below. For the following reasons, Genstar should be required to indemnify and defend RIAC:

- The applicable insurance policy is a premises liability policy and provides coverage for bodily injuries which arise out of necessary and incidental uses of certain premises defined by the Policy;

- The use of the Airport by BSSI's customers and the designation of the landing and boarding zones is necessary and incidental to the use of the premises and, therefore, Ms. Costa’s injury is a covered loss *unless* excluded by a specific policy exclusion;

- Ms. Costa was, in fact, injured on premises used by BSSI and covered by the Policy and has brought claims against RIAC sounding in premises liability; and
- The Policy exclusion labeled "airport/skydiving" is ambiguous and illusory as to RIAC, and the Policy must be interpreted in favor of the additional insured RIAC to provide coverage.

## I. FACTS

Suzanne Costa and her family have brought an action, *Suzanne Marie Costa, et al. v. Daniel King, et al.*, C.A. No. PC 05-0140, which is currently pending in the Rhode Island Superior Court for Providence County ("Costa Action"). *See* Stipulation of Undisputed Facts at ¶ 37. Ms. Costa brings negligence claims against RIAC and BSSI for injuries she suffered to her arm as a result of an accident which is described in greater detail below. *Id.* at ¶¶ 38-41.

### A. The Parties to the Underlying Litigation.

North Central Airport is owned by the State of Rhode Island. RIAC is a corporation organized under the laws of Rhode Island and has been granted a leasehold interest for a term of 30 years pursuant to a July 1993 agreement with the State of Rhode Island. RIAC operates and manages the Airport under this agreement. *See* Stipulation of Undisputed Facts at ¶ 5. Hawthorne Aviation – Rhode Island, Inc. ("HARI") contracted with RIAC to provide management services for the Airport during the relevant time period. *Id.* at ¶6.

Blue Skies Skydiving, Inc., d/b/a Boston-Providence Skydiving Center ("BSSI") conducted skydiving operations at the Airport under written authorization provided by HARI. One condition of that authorization required BSSI to obtain "public liability insurance," with a bodily injury limit of $1,000,000, naming RIAC and HARI as additional insureds. Robert Spencer was the President and sole shareholder of BSSI at the time of the accident. *Id.* at ¶¶ 7-8. BSSI did, in fact, procure this insurance and it is that policy which is the subject of this

declaratory judgment action. BSSI did not procure any other insurance policies for its business at the direction of RIAC or HARI.

From the time that BSSI operated its operation at the Airport in 1999 through the time of Ms. Costa's accident, it paid a $250 monthly fee to RIAC's Airport manager for the non-exclusive lease of an area of the Airport, including the area BSSI designated as the landing zone. *See* Deposition of David Cloutier, attached hereto as Exhibit "A," at p. 43. BSSI also sub-leased from New England Aviation ("NEA") an additional area of Airport property on which it located its trailer, and where it parked its aircraft. *See* Stipulation of Undisputed Facts at ¶ 9.

BSSI operated its skydiving business out of a portable trailer/office owned by BSSI which is located on the grounds of the Airport and is depicted on **Exhibit 1** to the Stipulation of Undisputed Facts at or near the circled #8. The BSSI trailer is used by BSSI for storage, office space, and "ground school" training for skydivers, and was the only facility maintained and owned by BSSI at the Airport. RIAC had no role in the operation of the "ground school," in the training of skydivers, or in the operation of BSSI's business. The trailer is located on the portion of the Airport leased by RIAC to NEA. *See* Stipulation of Undisputed Facts at ¶¶ 17-20. The boarding zone where Ms. Costa was injured is also on the property leased by NEA from RIAC, as was the aircraft that injured Ms. Costa. *Id.* at ¶ 28.

**B. <u>The Accident For Which Coverage Is Sought.</u>**

The underlying matter for which coverage is sought involves an accident that injured Suzanne Costa. During certain times on September 29, 2002, Ms. Costa was engaged in skydiving activities at the Airport. *See* Stipulation of Undisputed Facts at ¶ 21. Those skydiving activities were conducted by BSSI through its employees and agents. During flight, Ms. Costa and several other skydivers exited a Cessna Grand Caravan 208B aircraft (the "Jump Aircraft")

and began their descent from an altitude of approximately 14,000 feet, after which the Jump Aircraft proceeded to land at the Airport. At approximately 5,000 feet, Ms. Costa engaged her parachute and completed her descent "under canopy." *Id.* at ¶¶ 21-24.

The Jump Aircraft landed prior to Ms. Costa's landing. Upon landing, the Jump Aircraft proceeded to the designated boarding area *selected by BSSI*, with its engine running and its propeller rotating, in order that a group of passengers could board for the next skydiving event. (This practice is referred to as "hot loading.") The "A/C" mark on **Exhibit 1** to the Stipulation of Undisputed Facts is an approximation of the location of the Jump Aircraft at the time of the accident. The Jump Aircraft was located in the "tiedown area" which was leased from RIAC to New England Aviation[1] ("NEA") and used by BSSI. *Id.* at ¶¶ 25-28. The "tiedown area," also known as the "boarding zone," was designated by BSSI and was the only designated zone for the loading of skydivers at the Airport.

As Ms. Costa descended through the air and approached the Jump Aircraft, it was oriented so that the tail was to her left and the propeller was to her right. *Id.* at ¶29. It is not disputed that, at some time after Ms. Costa jumped out of the Cessna aircraft, her parachute was pulled into the aircraft's rotating propeller. *Id.* at ¶¶ 33-35. Prior to Ms. Costa's injury, she was tackled by Darren Fiske, BSSI's jumpmaster, who had attempted to direct her body away from the propeller. *Id.* at ¶ 30.

Ms. Costa's parachute became entangled in the propeller, and she was dragged by her parachute into the rotating propeller. Ms. Costa made between one and two revolutions around the propeller, suffering serious (but not fatal) injuries as a result. *Id.* at ¶ 35.

---

[1] NEA leased land from RIAC; NEA has been joined as an additional defendant pursuant to an indemnification obligation in the lease between it and RIAC.

Ms. Costa testified that she touched down moments *prior* to being tackled. Witnesses Ken Thomas, John Martin and Robert Gow testified that Ms. Costa touched down moments *after* being tackled. *Id.* at ¶¶ 31-32. Nevertheless, whether Ms. Costa's parachute became tangled in the Jump Aircraft's propeller before or after she touched down is not material to the instant coverage analysis as to RIAC.

### C. Costa's Claims Against The Defendants.

Costa's negligence claims in the underlying litigation against RIAC are based solely upon the manner in which the landing and boarding sites were situated and sized pursuant to BSSI's designation.

Against RIAC, Costa alleges that:

> Defendant RIAC, as owner of the North Central Airport, owed a duty to Ms. Costa to, *inter alia*, design, manage and operate the North Central Airport facility in a manner so as to ensure that persons using the facility in the exercise of due care, including Ms. Costa, did not come into contact with the rotating blades of airplane propellers while engaged in skydiving or other activities. Said duty includes, but is not limited to, the duty to exercise due care and skill in the provision of property and services...in the entrustment of property and authority to its agents...and other third parties, and in the general operation and management of the North Central Airport.

*Id.* at ¶ 38.

The allegations against RIAC clearly sound in premises liability: according to Ms. Costa's allegations, had the landing and boarding zones been designated so that they were farther away from each other, this accident would not have happened because Ms. Costa would have had ample room to land safely. Accordingly, the allegations against RIAC bring this case into the risk coverage of the Policy unless a specific exclusion applies.

Costa's claims against BSSI are based on the location of the landing and boarding zones, BSSI's instruction to Costa in the use thereof, and BSSI's signage, marking and guarding of the various locations. Costa has averred that the landing and boarding sites were designated by BSSI. *Id.* at ¶¶ 37-41.

Against BSSI, Costa alleges that:

> The BSSI defendants owed a duty of care to Ms. Costa, which duty included, without limitation, a duty to design, manage and operate the BSSI facility in a manner so as to ensure that their customers, including Ms. Costa, did not come into contact with the rotating blades of airplane propellers while engaged in skydiving or other activities in the exercise of due care on the BSSI business premises.

*Id.* at ¶ 40**.** In other words, as alleged by Costa, BSSI was allegedly negligent for "failing to maintain a safe distance between the boarding site where airplanes would be parked while skydivers embarked on skydiving flights, and the designated skydiver landing area." Complaint at ¶ 31, attached as Exhibit 3 to Stipulation of Undisputed Facts.

**D. <u>The Insurance Policy At Issue.</u>**

Defendant Genstar issued a "Commercial General Liability" policy to BSSI (the "Policy") which named RIAC as an additional insured, and which applies to the period of time during which the accident occurred. No agents of RIAC were involved in the negotiations leading to the issuance of the Policy, which was the responsibility of BSSI to obtain. True and accurate copies of various documents contained in the Policy are attached as **Exhibit 4** to the Stipulation of Undisputed Facts, which contains twenty pages. *See* Stipulation of Undisputed Facts at ¶¶ 43-45.

The Policy is the only coverage purchased by BSSI in response to RIAC and HARI's requirements for approval to use the Airport for skydiving activities.

**Exhibit 4** is divided into the following parts: (1) Common Policy Declarations (1 page); (2) Common General Liability Declarations (1 page); (3) Schedule of Forms and Endorsements (l page); (4) Additional Insured (HARI.) (1 page); (5) Additional Insured (RIAC) (1 page); (6) Limitation of Coverage to Designated Premises or Project (1 page); (7) Exclusion – Designated Professional Services (1 page); (8) Combined Provisions Endorsement (4 pages); (9) Minimum Earned Premium (1 page); (10) Additional Insured (RIAC) (1 page) (duplicate of (5)); (11) Insurance Binder (1 page); (12) Denial of Coverage (6 pages). (Policy, Ex. 2.). *Id.* at ¶ 46.

The Insurance Binder document, dated March 27, 2002, states that "THIS BINDER IS A TEMPORARY INSURANCE CONTRACT..." which expires on April 26, 2002. It also provides that the "DESCRIPTION OF OPERATIONS/VEHICLE/PROPERTY" is "PREMISES LIABILITY – OFFICE. NO COVERAGE INTENDED FOR ANY ACTUAL SKYDIVING OR RELATED OPERATIONS." The Insurance Binder document was intended by the parties to memorialize the insurance contract upon agreement, and was in effect only until the complete Policy terms were transmitted to the insured, after which those terms superseded the Insurance Binder as the operative policy document. *Id.* at ¶¶ 47-48.

The "Common Policy Declarations" document, which is signed and dated April 3, 2002, provides for "Commercial General Liability Coverage." The "Commercial General Liability Declarations" document provides for liability limits of $1,000,000 per occurrence. Section I.A.1.a. of the Policy states that Genstar "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' . . . to which this insurance does not apply." Section I.A.1.b. of the Policy states

that "[t]his insurance applies to 'bodily injury' . . . only if' that bodily injury "takes place in the coverage territory." *Id.* at ¶¶ 49-52. Under the Policy's terms, it is a premises liability policy.

The "Exclusion – Designated Professional Services" document states that "[w]ith respect to any professional services shown in the Schedule . . . . [t]his Insurance does not apply to 'bodily injury' . . . due to the rendering of or failure to render any professional service." The "Schedule" describes professional services as "AIRPORT/SKYDIVING AND RELATED SERVICES." The "Limitation of Coverage to Designated Premises or Project" document states that "[t]his insurance applies only to 'bodily injury' . . . and medical expenses arising out of . . . [t]he ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises . . . ." The Schedule is blank, so the designated premises are those premises defined "in the Declarations as applicable to this endorsement." *Id.* at ¶ 53-54.

The "Commercial General Liability Declarations" document defines the "premises" as "6 Albion Road, Lincoln, RI 02865." The Location Classification is described as "BUILDINGS OR PREMISES—OFFICE-OTHER THAN — NOT FOR PROFIT." The "Additional Insured – Mangers Or Lessors of Premises" document applicable to RIAC provides a "Designation of Premises (Part Leased to You)" as "6 Albion Road, Lincoln, RI 02865." That document also states that "Section II [of the Policy] is amended to include as an Insured [RIAC] . . . but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you . . . ." *Id.* at ¶¶ 55-57.

6 Albion Road refers to BSSI's trailer out of which its business was run and its jump school was conducted. *Id.* at ¶ 56. The trailer was the only building used by BSSI and was, therefore, the only premises with a physical address that could be identified in the Policy. The "6

Albion Road" designation was, therefore, intended to refer to BSSI's entire use of the Airport premises. Indeed, the "premises" as identified in the Policy is more expansive than the trailer itself, despite Genstar's arguments to the contrary. It is not disputed that BSSI used Airport premises other than the trailer in the operation of its business at the Airport. Indeed, BSSI used land leased by NEA from RIAC to load passengers into its airplane in preparation for their skydives, *Id.* at ¶ 28, and also used airport premises as a drop zone for its customers to land after jumping. Genstar attempts to define the "Premises" identified in the Policy too narrowly, and, as discussed in greater detail below, attempts to create artificial ambiguities over the coverage provided to RIAC which simply do not exist under the present circumstances.

The undisputed facts are that Ms. Costa suffered a "bodily injury" which occurred in the "coverage territory." Ms. Costa's injury arose out of the use of the insured premises *and* operations that were necessary and incidental to the use of those premises. Accordingly, coverage is available to the insured and additional insureds under the Policy for Ms. Costa's injuries *unless* a specific exclusion applies.

### E. RIAC's Motion For Summary Judgment In The Costa Litigation.

On or about March 13, 2008, RIAC filed a Motion for Summary Judgment in the Costa Litigation arguing that a Release signed by the Suzanne Costa required the dismissal of the lawsuit against RIAC. At issue in RIAC's Motion, at least in part, was whether the Release applied to "skydiving activities" such that the manner in which Ms. Costa was injured was encompassed by the Release.[2]

---

[2] The front page of the Waiver provided in capital, underlined letters: I UNDERSTAND THAT THE SPORT OF SKYDIVING EVEN IF PROPERLY PRACTICED COULD CAUSE SERIOUS INJURY OR EVEN DEATH. Paragraph 2 of the Waiver provides in capital letters: I WILL NOT SUE, OR MAKE A CLAIM AGAINST the Released Parties for damages or other losses sustained as a result of my participation in parachuting activities. Ms. Costa affixed her initials immediately after this sentence. *Id*. This paragraph continues, in part: "I also agree to INDEMNIFY AND HOLD THE RELEASED PARTIES HARMLESS from all expenses, judgments, awards or

On June 3, 2008, a hearing on RIAC's Motion was held before the Honorable Patricia A. Hurst. Prior to RIAC's counsel's argument, the Court gave an assessment of the Motion and the manner in which Ms. Costa was injured. The Court stated as follows:

> I thought the motion ought to be denied. The plaintiff's injuries didn't stem from her participation in an inherently dangerous sport; that is, skydiving. She had satisfactorily completed her dive. The release is clearly aimed at injuries sustained as a result of the parachuting activity or some defect in the landing area itself.

*See* Transcript at p. 1, attached hereto as Exhibit "B." The Court further stated that:

> She [Ms. Costa] had completed her dive safely of her jump. She had completed her jump, the skydive, safely. She was on the ground and the pilot had the engine and propeller going.

*Id.* at p. 2.

The Court denied RIAC's Motion for Summary Judgment, holding that the Release did not apply to the injuries suffered by Ms. Costa. RIAC disagrees with the Court's holding and contends that the Release's language is broad enough that its application should not be limited solely to parachuting activities, as it applies to any incidental use of the Airport by Ms. Costa due to her presence there and precludes her recovery in the underlying litigation. But RIAC does agree that Ms. Costa's allegations *as against RIAC* do not constitute a skydiving activity.

---

costs, <u>including attorney's fees,</u> incurred in connection with any claim brought by me, my estate, heirs, or by <u>any person</u> as a result of my participating in parachuting activities … ." (emphasis in original). *Id.* Paragraph 3 of the Waiver provides in capital letters:

> I EXPRESSLY AND VOLUNTARILY ASSUME ALL RISK OF DEATH OR PERSONAL INJURY SUSTAINED WHILE PARTICIPATING IN PARACHUTING ACTIVITIES WHETHER OR NOT CAUSED BY ANY DEGREE OF NEGLIGENCE OR FAULT OF THE RELEASED PARTIES OR ANY DEFECT IN THE AIRCRAFT OR EQUIPMENT PROVIDED OR LANDING AREA OR SURROUNDINGS.

Ms. Costa also initialed this paragraph. Ms. Costa also initialed after paragraph 4 of the Waiver, which states: "I have been advised and recognize that my parachuting activities are not covered by any personal accident or general liability insurance policy issued to the Released Parties."

## II. LEGAL ARGUMENT

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Rathbun v. Autozone, Inc*. 361 F.3d 62 (1st Cir. 2004) (citing Fed.R.Civ.P. 56(c)). Once the moving party avers the absence of genuine issues of material fact, the nonmovant must show, through materials of evidentiary quality, that such a dispute exists. A properly supported motion for summary judgment cannot be defeated by relying upon improbable inferences, conclusory allegations, or rank speculation. *Id.* (citing *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)).

### B. The Manner In Which Rhode Island Courts Interpret Insurance Policies And Exclusions Requires Genstar To Provide Coverage In This Case.

#### 1. Policy Interpretation Is A Matter Of Law

The construction of an insurance policy and the coverage provided thereunder is a matter of law and the issue present in this matter is, therefore, appropriate for summary judgment. *See Mullins v. Federal Dairy Co.*, 568 A.2d 759, 762 (R.I.. 1990); *Mallane v. Holyoke Mut. Ins. Co.*, 658 A.2d 18, 20 (R.I. 1995).

Under Rhode Island law, "the insured seeking to establish coverage bears the burden of proving a prima facie case, including but not limited to the existence and validity of a policy." *Emhart Industries v. Home Ins. Co.*, 2007 WL 2782989 *4 (D. R.I. Sept. 26, 2007) (citing *Gen. Accident Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc.*, 716 A.2d 751, 757 (R.I. 1998)). After the insured meets this burden, "[t]he insurer then bears the burden of proving the applicability of policy exclusions and limitations in order to avoid an adverse judgment." *Id.*

The Policy is a premises liability policy and Ms. Costa's accident occurred on premises that were intended to be insured under the Policy. No exclusion applies to deny coverage to RIAC, and this Court should order Genstar to defend and indemnify RIAC.

### 2. The Policy Is A Premises Liability Policy And Provides Coverage to RIAC For Ms. Costa's Injuries Unless A Specific Exclusion Applies.

The Policy is a premises liability policy and provides coverage for bodily injury arising out of the ownership, maintenance or use of BSSI's premises at the Airport *and* operations necessary or incidental to those premises. *See* Stipulation of Undisputed Facts at ¶ 48. The Policy was the only coverage procured by BSSI for its operations at the Airport, and was purchased pursuant to RIAC's agent's requirement that BSSI procure "public liability insurance" with a bodily injury limit of $1 million, naming RIAC as an additional insured. *Id.* at ¶ 7.

The allegations against RIAC clearly sound in premises liability. Indeed, the Plaintiff has alleged that RIAC failed to maintain a safe distance between the boarding site where airplanes would load skydivers and the landing site where skydivers were directed to land. *See* Stipulation of Facts at ¶ 40. Although it is not disputed that RIAC did not designate the particular boarding and landing zones, the allegations by Ms. Costa against RIAC relate to the layout of the boarding and landing zones . *Id.* at ¶16.[3] The allegations against RIAC, therefore, sound in premises liability.

Genstar attempts to split hairs and create an artificial ambiguity in the coverage provided to RIAC by comparing differences in two documents describing the coverage provided to RIAC. Genstar compares the Policy providing coverage to BSSI for "the ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those

[3] BSSI designated the boarding and landing zones, and, in fact, distributed a document called "Drop Zone Rules" to its customers which described their locations *See* Stipulation of Undisputed Facts at ¶ 13. Any designation of the

premises" to the document listing RIAC as an additional insured which purports to provide coverage for "liability arising out of the ownership, maintenance, and use of that part of the premises leased [to BSSI]." Genstar argues that the absence of the "necessary or incidental" language limits the coverage to be provided to RIAC, that it creates a *different* type of coverage than that provided to BSSI, and that it limits the available coverage to BSSI's trailer. This argument must be rejected.

First, there is no premises that was "leased" to BSSI, and Genstar has not identified the particular premises to which this language could apply. Indeed, the trailer identified as 6 Albion Road was *owned* by BSSI, and was located on a larger portion of land leased by New England Aviation ("NEA") from RIAC. *See* Stipulation of Undisputed Facts at ¶¶ 17, 28. It is similarly not disputed that *RIAC did not lease any land to BSSI*; rather, BSSI operated at North Central Airport pursuant to permission granted to it by RIAC. *Id.* at ¶ 9. If, however, the document naming RIAC as an additional insured *does* relate only to premises "leased" to BSSI, it is clear that BSSI paid a monthly $250 fee to RIAC's Airport manager to use the Airport. Accordingly, to the extent that the coverage exists as set forth in the document naming RIAC as an additional insured, it is clear that it refers to *BSSI's entire use of the Airport premises, and not just the trailer*. There is at least an ambiguity as to the coverage to be provided to RIAC, and this ambiguity should be resolved in favor of providing coverage to RIAC. The document naming RIAC as an additional insured is, therefore, in and of itself, ambiguous and any limitation on coverage is illusory.

Second, there is no evidence that BSSI intended to procure a different type of coverage for RIAC than it procured for itself, nor is there any plausible reason why BSSI would do so. As

---

landing and boarding zones would have had to occur from BSSI's sole location at the airport - i.e., the insured premises.

a result, the failure of the document naming RIAC as an additional insured to include the "necessary or incidental" language is meaningless in this context, the attempt by Genstar to distinguish the coverages is splitting hairs, and Genstar attempts to read an ambiguity into the coverage that simply does not exist.

It is not clear to what particular "leased premises" the document adding RIAC as an additional insured was meant to refer. But it is clear that it was *not* meant to limit the scope of the premises liability coverage which covered the premises and operations necessary and incidental thereto. Similarly, the "premises leased" was not meant to limit the premises to the BSSI trailer, which was owned and not leased by BSSI. If anything, the document adding RIAC as an additional insured *increases* the scope of coverage, because it is clear that the only land "leased" by or to anyone at the Airport was leased by RIAC to NEA, and this accident occurred on land leased by NEA from RIAC. *See* Stipulation of Undisputed Facts at ¶¶ 17, 28. To the extent BSSI "leased" anything, it leased entire Airport premises on which it conducted its operations as a result of its $250 monthly payment. Genstar reads the coverage provided to RIAC much too narrowly, provides no definition of the "premises leased" and provides no support that such language in any way limits the coverage provided to RIAC to the BSSI trailer.

The BSSI trailer, which was the *only* facility maintained and owned by BSSI at the Airport, is used by BSSI for storage, office space, and "ground school" training for skydivers. *Id.* at ¶18. The designation of landing and boarding zones, and BSSI's customer's use of the Airport, are, therefore, necessary and incidental uses of the insured premises. Similarly, the training of skydivers, the retention and payment to pilots, *and the skydiving activities themselves*, are necessary and incidental uses of the insured premises because the premises was used as a jump school, was the sole location of BSSI, was the location from which BSSI ran its entire

operation, and was the only physical address of BSSI at the Airport. *Id.* The Premises included in the Policy was intended to refer to BSSI's use of the Airport.

The contents of the declaration page is also important when determining the coverage to be provided to an insured under an insurance policy and here indicates that Ms. Costa's injuries were covered losses. Rhode Island courts have held that "the contents of the declarations sheet is of paramount importance because it is common knowledge that the detailed provisions of insurance contracts are seldom read by the consumer." *Mallane v. Holyoke Mut. Ins. Co.*, 658 A.2d 18, 20 (R.I. 1995) (citing *Sentry Ins. Co. v. Grenga*, 556 A.2d 998, 1000 (R.I. 1989)). Further, the "reasonable expectations of coverage raised by the declaration page cannot be contradicted by the policy's boilerplate unless the declaration page itself clearly so warns the insured." *Id.* (citing *Lehrhoff v. Aetna Casualty & Surety Co.*, 271 N.J. Super. 340, 347, 638 A.2d 889, 892 (1994)).

The Common Policy Declarations for the Policy are attached to the Stipulation of Undisputed Facts at pages "Policy 1" through "Policy 2," and clearly demonstrate that the Policy was a commercial general liability policy intending to provide coverage for personal injuries occurring while BSSI operated its business. As evidenced by the Common Policy Declarations, BSSI procured $1 million in coverage for "personal injury" - an implicit recognition that the Policy intended to cover at least certain injuries occurring to BSSI's customers. The Policy is specifically identified as a premises liability policy, and the *only* mention of an exclusion relates to coverage for "products/completed operations." The declaration page identifies "two additional insureds" and makes no mention of any coverage limitation - *or any difference in coverage at all* between BSSI and the additional insureds.

**3. Ms. Costa's Accident Occurred On The Premises As That Term Is <u>Defined Under The Policy.</u>**

This accident occurred on the "premises" as that term is defined under the Policy because Ms. Costa was injured on the premises as defined under the Policy or on land that was a necessary and incidental use of those premises. As discussed above, the absence of the "necessary or incidental" language in the document identifying RIAC as an additional insured cannot be read to provide a lesser coverage than provided to BSSI, and RIAC is entitled to define the insured premises in the same manner as could be done by BSSI. In addition, even if the document listing RIAC as an additional insured with regard to the "premises leased to" BSSI effects the coverage available to RIAC, that so-called "leased premises" can only apply to the land leased by RIAC to NEA - which is where Ms. Costa's accident occurred - or to BSSI's use of the Airport. It is clear that Ms. Costa's accident occurred on the premises insured by the Policy.

Ms. Costa's injuries fall under the risk coverage provided by the Policy because Ms. Costa's claims against RIAC sound in premises liability. RIAC has satisfied its burden of making out a *prima facie* case for coverage. Accordingly, the burden shifts to Genstar to show the applicability of a specific Policy exclusion in order to justify its denial of coverage. General Star is, therefore, obligated to defend and indemnify RIAC in the underlying *Costa* litigation unless a specific exclusion applies. As discussed below, the exclusion focused on by Genstar for "airport/skydiving activities," does not apply to Costa's claims against RIAC.

**4. Insurance Policies And Exclusions Are To Be Interpreted In Favor Of Providing Coverage To The Insured.**

**a. Policy Exclusions Must Be Clear And Unambiguous In Order To Be Enforced Against The Insured**

Because the Policy is a premises liability policy which provides coverage for bodily injury occurring on the insured premises, at issue in this case is whether Ms. Costa's claims against RIAC involve a "skydiving activity" or an "airport/skydiving" activity such that they are excluded from coverage under the Policy. The claims against RIAC sound solely in premises liability and those claims do not involve skydiving or airport activities and, therefore, no exclusion applies.

As a general rule, Rhode Island courts apply the same rules when construing insurance policies as they do when construing contracts. *See Martinelli v. Travelers Ins.; Co.*, 687 A.2d 443, 445 (R.I. 1996). An exclusion from coverage in an insurance policy must be clear and unambiguous in order to be enforceable. *See, e.g., Campbell v. Norfolk & Dedham Mutual Fire Ins. Co.*, 682 A.2d 933, 935 (R.I. 1996) (citations omitted). Here, Genstar does not make an attempt to define those activities that could be considered "airport-related," and there is no definition of that term in the Policy. RIAC contends, as addressed below, that Ms. Costa's accident was not an airport or skydiving activity. Alternatively, RIAC contends that both the term "airport activities" and "skydiving activities" are ambiguous and, therefore, the Policy should be interpreted to provide coverage to RIAC for the claims against it which clearly sound in premises liability.

It is well-established that, "if the terms of an insurance contract are subject to more than one reasonable interpretation, the policy will be construed in favor of the insured to avoid forfeiture." *Id.* (citing *Mallane v. Holyoke Mut. Ins. Co.*, 658 A.2d 18, 20 (R.I. 1995); *Massasoit Housing Corp. v. Town of North Kingstown*, 75 R.I. 211, 217, 65 A.2d 38, 40 (1949)); *See also*

*Zanfagna v. Providence Washington Ins. Co.*, 415 A.2d 1049, 1051-52 (R.I. 1980) (citations omitted) (when a policy "admits to two reasonable meanings as far as the exclusion is concerned...our rule of construction requires that we charge the fault to the insurer who selected the language and that we accept the interpretation that favors the insureds").

Insurance policies are construed in favor of the insured because they are essentially contracts of adhesion. *See Bush v. Nationwide Mutual Ins. Co.*, 448 A.2d 782, 784 (R.I. 1982) (citing *Pacheco v. Nationwide Mutual Ins. Co.*, 114 R.I. 575, 337 A.2d 240 (1975)).

In determining whether a contract is clear, Rhode Island courts view the policy in its entirety and give to its language its “plain, ordinary and usual meaning.” *Campbell*, (citing *Amica Mutual Insurance Co. v. Streicker*, 583 A.2d 550, 552 (R.I. 1990) (citation omitted)). The test to be applied when interpreting a policy “is not what the insurer intended by his [or her] words, but what the ordinary reader and purchaser would have understood them to mean.” *Id.* (citing *Pressman v. Aetna Casualty and Surety Co.*, 574 A.2d 757, 760 (R.I. 1990) (citation omitted)).

**b. Courts Will Refuse To Enforce A Policy Interpretation That Renders Coverage Illusory.**

The interpretation of the policy urged by Genstar and its interpretation of the "airport/skydiving" exclusion would render the Policy illusory because, while the Policy purports to provide personal injury premises liability coverage to RIAC, Genstar's interpretation of the exclusion has the effect of excluding coverage for *any and all* claims against RIAC of any nature whatsoever. Indeed, if the "airport/skydiving" exclusion can preclude coverage for RIAC in these circumstances, where the allegations against RIAC sound in premises liability and relate solely to North Central Airport's land, there can be no premises liability coverage for RIAC *under any circumstance*. If the "airport/skydiving" exception is applicable here, then the

coverage for RIAC under the Policy is illusory because, as discussed below, *all* claims against RIAC would be excluded.

Courts will refuse to enforce an interpretation of an exclusion that renders coverage under a policy "illusory." *See, e.g., Employers Mutual Casualty Co. v. Pires*, 723 A.2d 295,298 (R.I. 1999) (citing *Pressman v. Aetna Casualty & Surety Co.*, 574 A.2d 757 (R.I. 1990)). Indeed, "absent any ambiguity in the policy's language, [courts] will apply the exclusion as written unless doing so would render illusory the coverage provided." *Pires*, 723 A.2d at 299.

In *Pressman*, the court refused to enforce the defendant's interpretation of an exclusion that would have denied coverage for losses sustained as a result of an interruption to his psychology practice that was caused by a power failure when a tree adjacent to his property fell and damaged a power line. The defendant Aetna denied coverage based on an exclusion for interruption of power that occurs "away from the described premises." The court refused to apply the exclusion and held that to do so would render coverage "illusory" and would "preclude coverage in almost any circumstance unless the insured had his own generator located inside the building." *Pressman*, at 758. *Pressman* confirmed that a court should interpret the policy language by ascertaining "not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean." *Id.* at 760 (citations omitted).

Genstar argues that an exclusion for "airport/skydiving activities" applies in this case to deny coverage to RIAC. But the interpretation urged by Genstar and the exclusion for Ms. Costa's injury would render the coverage for RIAC under the Policy completely illusory because, arguably, *any and every* claim made against RIAC - *an airport* - would relate to an "airport/skydiving activity." Indeed, RIAC is hard-pressed to identify any activity it performs that is *not* airport-related. The interpretation of the exclusion that Genstar urges can be

analogized to an automobile policy including an exclusion for "driving activities." The enforcement of such an exclusion and the application of an "airport activity" exclusion to this claim, is clearly absurd, renders the coverage for RIAC under the Policy illusory, and cannot be upheld by this Court.

The "airport/skydiving" exclusion cannot be separated into two separate "airport" and "skydiving" exclusions, as the "/" connector renders these terms incapable of being read separately. If the Policy had intended the "airport/skydiving" exclusion to be read as two separate exclusions, then it would have explicitly set forth two exclusions. It did not, however, do so. The "airport" aspect of the exclusion cannot, therefore, be read out of the overall Policy coverage exclusion and in order for any exclusion to apply there must be an "airport" activity.[4]

Genstar overreaches in its interpretation of "airport/skydiving activities" and, as a result, renders the Policy illusory and clearly in opposition to RIAC and BSSI's expectation of coverage.

**c. Courts Focus On The Insured's Reasonable Expectation Of Coverage When Determining Whether A Policy Provides Coverage.**

When determining whether coverage applies under certain circumstances, Rhode Island courts focus on the purchaser of the insurance policy and whether it is reasonable for the purchaser of an insurance policy to believe that coverage exists. *Campbell*, 682 A.2d at 935. If the interpretation of an exclusionary clause would lead to "unreasonable results," courts are not likely to enforce it. *Id.*

---

[4] Even if the exclusions could be read as two separate exclusions, the same logic would apply to the "skydiving" exclusion. RIAC's *sole* interaction with BSSI was to grant it permission to operate its business at the Airport and to provide the land to do so. Any interaction that RIAC had with BSSI would relate to a "skydiving activity" because BSSI is exclusively a skydiving business.

Robert Spencer, the President and sole shareholder of BSSI at the time of the accident, has not been located and has not been able to be deposed in connection with this action. His precise expectations of coverage, therefore, cannot be ascertained. Nevertheless, it is reasonable for this Court to conclude that, because of BSSI's insurance requirements, it expected the Policy it procured from Genstar to provide coverage for RIAC for personal injuries occurring at the Airport as a result of the activities and services it performed there. Indeed, a letter sent by Mr. Spencer to RIAC indicates that BSSI clearly recognized that procurement of an insurance policy naming RIAC as an additional insured was an important and absolutely necessary prerequisite for BSSI to conduct business at the Airport. In a letter dated June 25, 2002, Mr. Spencer confirmed that BSSI was complying with RIAC's requirements for a provisional approval to conduct skydiving operations at the Airport by listing all the steps BSSI had taken. The *very first* item of compliance listed by BSSI stated that "a current copy of our insurance coverage is filed with RIAC and Hawthorne Aviation Operations." *See* Letter dated June 25, 2003, attached hereto as Exhibit "B." It is clear, therefore, that BSSI expected that RIAC would have insurance coverage - and have the same coverage as BSSI - and that the procurement and validity of such coverage was paramount.

It is not disputed that, as a requirement for conducting its activities at North Central Airport, BSSI was required to purchase insurance naming RIAC as an additional insured. *See* Stipulation of Undisputed Facts at ¶7. It is reasonable to conclude that BSSI would not have procured coverage for RIAC that was illusory, inapplicable under any circumstances to RIAC, or lesser than the coverage afforded to BSSI. The interpretation of the coverage available to RIAC that is urged by Genstar, however, would render the policy illusory and counter to BSSI's reasonable expectations.

RIAC's involvement with BSSI was limited. Indeed, RIAC had no role in designating the drop zone or boarding zone and did not play any role in providing services to BSSI's customers. RIAC's *only* involvement with BSSI was to provide permission to BSSI to use North Central Airport for its business and to provide the land on which to do so. It is, therefore, reasonable for BSSI to have expected that the coverage it procured would have provided coverage to RIAC for claims involving RIAC's grant of permission to use North Central Airport or the Airport's land itself. Ms. Costa's claims against RIAC only involve its designation of the landing zone and boarding zone, and, accordingly, relate solely to the Airport's land. BSSI would have expected that the coverage it procured for RIAC provided coverage for Ms. Costa's claims against it. Application of the "airport/skydiving" exclusion to the claims against RIAC would, therefore, lead to an unreasonable result and this Court should hold that the skydiving exclusion does not apply to claims against RIAC and that Genstar is obligated to provide coverage to RIAC in this case.

## III. CONCLUSION

RIAC has satisfied its burden of showing the existence of coverage for Ms. Costa's claims against it, and Genstar has failed to meet its burden to show that an exclusion exists to deny coverage to RIAC. Based on the foregoing, this Court should hold that the Policy provides coverage to RIAC for Suzanne Costa's injuries and that Genstar is obligated to defend and indemnify RIAC in the underlying *Costa* litigation.

PLAINTIFF
RHODE ISLAND AIRPORT CORPORATION
By Its Attorneys,

/s/ Lori Caron Silveira
Lori Caron Silveira (#3576)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
Telephone: (401) 274-7200
Fax: (401) 351-4607
E-Mail: lsilveira@apslaw.com

s/ David N. Zeehandelaar
By: David N. Zeehandelaar
*Admitted pro hac vice*
BLANK ROME, LLP
One Logan Square
Philadelphia, PA 19103-6998

*Counsel for Plaintiff Rhode Island Airport Corporation*

**CERTIFICATION**

The undersigned hereby certifies that on the 13th day of August, 2008, a true copy of the within document was filed with the Court by electronic means (ECF), and notices of electronic filing were sent to the following counsel of record:

Dennis E. Carley, Esq.
Roberts, Carroll, Feldstein & Peirce, Inc.
Ten Weybosset Street
Providence, RI 02903

Daniel E. Burgoyne, Esq.
Roberts, Carroll, Feldstein & Peirce, Inc.
Ten Weybosset Street
Providence, RI 02903

/s/ *Lori Caron Silveira*