# EXHIBIT B

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC. SUPERIOR COURT

SUZANNE M. COSTA, et al :
:
Vs. : PC 2005-0140
:
DANIEL KING, et al :

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HEARD BEFORE

THE HONORABLE JUSTICE PATRICIA A. HURST

JUNE 3, 2008

APPEARANCES:

STEPHEN P. HARTEN, ESQUIRE
-and-
MEREDITH B. RENNER, ESQUIRE . . . . FOR THE PLAINTIFFS

HOWARD A. MERTEN, JR., ESQUIRE
-and-
JAMES W. RYAN, ESQUIRE . . . . . . . . FOR THE DEFENDANTS
(Piedmont Hawthorne, Hawthorne Aviation & RIAC)

DAVID D. BAGUS, ESQUIRE . . . . . . . FOR THE DEFENDANT
(McCole & King)

TIMOTHY J. GROVES, ESQUIRE . . . . . . FOR THE DEFENDANT
(Blue Skies & Spencer)

SUSAN L. INMAN
COURT REPORTER

# CERTIFICATION

I, SUSAN L. INMAN, hereby certify that the succeeding pages, 1 through 28, are a true and accurate transcript of my stenographic notes.

Susan L. Inman
Court Reporter

**JUNE 3, 2008, A.M. SESSION**

THE COURT: Costa vs. King.

THE CLERK: Counsel identify yourself for the record, please.

MR. HARTEN: Yes, Steve Harten representing the plaintiff.

MS. RENNER: Meredith Renner for the plaintiff.

MR. MERTEN: Howard Merten and James Ryan for Rhode Island Airport Corporation, Piedmont Hawthorne and Hawthorne Aviation of Rhode Island.

MR. BAGUS: David Bagus for defendants Kevin McCole and Daniel King.

MR. GROVES: Timothy Groves for the defendant, Blue Skies Skydiving, Incorporated and Robert J. Spencer.

THE COURT: Well, I read the motion papers. There was a lot of material here. I thought the motion ought to be denied. The plaintiff's injuries didn't stem from her participation in an inherently dangerous sport; that is, skydiving. She had satisfactorily completed her dive. The release is clearly aimed at injuries sustained as result of the parachuting activity or some defect in the landing area itself. I can't say that the plaintiff, as a matter of law, anticipated that she was at risk for this type of accident or injury when she signed the release and waiver.

The language of the waiver also is vastly too broad to be said to clearly and unambiguously absolve the defendants from liability for this particular accident. It seems outside the realm of the common risks commonly associated with parachuting. So, there are a lot of questions of fact here, including whether or not that particular injury causing instrumentality can fairly be said to be one of the risks of skydiving.

Furthermore, there are questions of fact concerning the question of whether or not the alleged negligence rose to the level of wantonness, recklessness or gross negligence. She had completed her dive safely of her jump. She had completed her jump, the skydive, safely. She was on the ground and the pilot had the engine and propeller going.

I don't know whether everybody started investigating commercial pilot regulations and safety standards, but it seems to me that it's a question of fact for the jury whether a pilot should be running a propeller knowing that somebody is coming down from up above. If there are any violations of law, that will be evidence of negligence and the level or degree of the negligence. You know, parties can contract against liability for harm caused by ordinary negligence, but they can't insulate themselves against gross negligence. That's against

public policy.

So, I thought there were just a multitude of factual questions here. I'm inclined to deny the motion, I'll hear you on it of course.

MR. MERTEN: Thank you, your Honor. Howard Merten for what I've called the Airport defendants.

As I understand the Court's comments, there's essentially two elements driving your ruling at this point. One is, this wasn't related to her parachuting activity; and, second is the gross negligence issue. So let me deal with each of those.

THE COURT: I won't split hairs about the word "related." Obviously, it was in some form related because that's how she ended up where she was.

MR. MERTEN: Right.

THE COURT: The question is whether or not this particular harm or risk is something that is a risk inherent in the skydiving. An inherent risk of skydiving is that your chute is not going to open. An inherent risk in skydiving is that when you hit the ground you're going to hit a pothole that nobody noticed, or maybe somebody even did notice, and you're leg gets broken, or maybe your neck or your back. Another risk is that you get blown someplace off shore and end up in wherever. Is one of the risks that a pilot is going to leave an engine

and a prop running as you're coming down? I think that's probably a fact question.

MR. MERTEN: I would submit, your Honor, that the starting point for this has to be the language of the release, whether the release language covered what happened here. And, there's the definition of parachuting activity on Page 1 of the release, and it talks about parachuting jumping, ground instruction, flying and related activities. To the extent this is related to -- related to her parachuting, then it is within the contemplation of this.

THE COURT: So, if she safely dodged the propeller, walked into the hangar, walked into the ladies room and slipped on a banana peel, this release would cover it?

MR. MERTEN: No, but if she walked into the lady's room and got choked by the parachute which hadn't come off yet, maybe it would because it related to the parachute.

THE COURT: I think reasonable minds can differ on all that because she has already completed the jump, and I'm not sure if she gets her chute tangled up in the door and trips that it hasn't become so attenuated that it's not part of the activities.

MR. MERTEN: In the hypothetical you provided, she finished, she walked over into the landing zone area and

into another building. Here it was instantaneous. And, there's a quote in the papers we filed, after a split second after touching the ground she was caught up by the propeller. She was in the landing zone. She was landing, still had the parachute on. The parachute was the mechanism by which her injury occurred, and all of that is related to parachuting activity. The landing in the parachuting activity, the landing has to be part of what's covered in this release. That's the tricky part. All the way down from to an inch above the ground, that's the easy part.

THE COURT: I know, gravity helped.

MR. MERTEN: So, that has to be covered.

THE COURT: And, assuming the jury does say it's sufficiently connected that it's part of the activity, the next question is whether the pilot's conduct in letting that engine run knowing that somebody was headed down from up above, the next question is whether or not this is negligence; and, if so, is it so reckless so insane, so stupid, that the release doesn't cover it?

MR. MERTEN: And, I want to get that, but before I do, one other thing that occurs to me is that we provided to the Court ten cases involving parachuting activity, and if you look at the panoply of the things that went wrong, the language of the releases are all the same

basically, and some of them get caught on wires, hit by a vehicle, so it is, in fact, the essence of the landing I think is covered by these waivers. And, I think that's a question of law for the Court and not a jury question in the context of this case.

With respect to the gross negligence, your Honor --

THE COURT: Well, part of that is the problem in the release. You know, I've been around long enough to read some of these releases and to preside over cases involving these releases. When I was a practitioner I drafted some of those kinds of releases. This release is exceptionally broad, and some releases are aimed a little bit more tightly, and they really notify the individual of what the kinds of risks are. See, when you have a release that is this broad, you get to the question of, Well, wait a minute, this is a person who doesn't know skydiving, what are the risks that the ordinary person would reasonably foresee to be involved in skydiving such that when they're signing this release they understand what they're releasing? And, is this one of those things? See, that's the trouble with a really broad release that doesn't do a good job in ticking through each one of the more specific risks involved.

MR. MERTEN: There is some elements in this release that discuss that, your Honor. If you look at --

THE COURT: Some, yeah.

MR. MERTEN: The fourth page, I have read the definition of what parachuting activities is, which is all activity related. The scope of the activity is meant to be broad. It is meant to cover everything connected with the parachuting, including ground instruction, flying, and landing I would submit. With respect to the risks that could be perceived --

THE COURT REPORTER: Please slow down.

THE COURT: See, that's the problem. Landing. If I'm reading this, and I'm an ordinary person, I think there's risks associated with landing. I might break my leg. I might land in the wrong spot because I can't control my chute. All kinds of things. Do I think after I have landed, my chute is going to get sucked into a plane engine? I can't say as a matter of law that that is a risk that this lady undertook or intended to --

MR. MERTEN: Well, I would submit two things with respect to those comments, your Honor. One is, first we've cited some cases in our reply memorandum which address that very issue, that talk about the scope of the risk with respect to skydiving should be construed broadly to effectuate these releases, and those are in the reply brief.

The second thing is, even in plaintiffs' papers,

plaintiffs themselves point out that even the most experienced skydiver doesn't land in the right spot.

And, the reason I was drawing the Court's attention to the fourth page of this release, it's a graphical depiction where this woman would be landing, right next to an runway, next to roads, next to trees, next to fences. So, it would not work and you could not make a release that would define all of the things that somebody might land near or on that would cause problems because you could be blown in a mile radius. That's one of the risks you take when you jump out of an airplane. So, to ask somebody in a release to define all of the things specifically wouldn't work. But, certainly landing and landing with objects and landing on objects or near objects that are dangerous, cars, planes, trees, fences, all of those are within the comprehension of someone who took off on this very runway on a plane and saw from the sky the trees, the cars, the fences. There's a road right next to this airport, so do we stop traffic?

THE COURT: I would expect that I might land on a tree or a car or get blown off track. Would I expect that a pilot would leave the engine running when he knows I'm coming down from overhead? I'm not sure I would expect that, and I can't say as a matter of law that someone should.

But, even so, that still takes us to the question of the degree of negligence. He was a commercial pilot, right?

MR. MERTEN: He was a commercial pilot, your Honor.

THE COURT: And, I know there's a host of regulations and safety standards and all kinds of things that govern what commercial pilots should do, can't do or must do.

MR. MERTEN: There are, and three of them were submitted by the plaintiffs as exhibits in these motion papers, Exhibit 14, Exhibit 15 and Exhibit 22 of the FAR, the Federal Aviation Regulation.

THE COURT: You've got to slow down.

MR. MERTEN: The advisory circular that was put out by the FAA, Federal Aviation Administration, and the U.S. Parachute Association Basic Safety Guidelines, and none of those prohibit hot loading, the issue we're talking about here. So, the safety standards one would look to don't include this as something that a commercial pilot should not do.

THE COURT: But, these are not the only safety standards. That's what I'm getting to. There are safety standards that apply to parachuting, but there's also some safety standards, I would imagine, that apply to everything, and I'm pointing out that those very well

could be applicable. Even if they're not, and even if these are the only standards, that's just some evidence of negligence. Either way, I think it's a jury question of whether this is reckless conduct.

MR. MERTEN: Well, I would suggest that they're the only regulations that have been brought to the attention of this Court by the plaintiffs, so they're the only regulations that we can go on, and none of them prohibit the conduct they are saying is gross negligence. And, they go on for pages about what you should or shouldn't do.

THE COURT: Right, and just because it's not prohibited doesn't mean that it's not negligent. That's only some evidence of negligence.

MR. MERTEN: What we're talking about, as I understand it, if you assume the release applies to parachuting activity, then the only thing that survives, according to the plaintiffs, is the gross negligence. And, to the extent that there are extensive regulations respecting parachuting and skydiving and none of them prohibit this activity, I would submit to you, does go to whether or not this is gross negligence. If there were a statute or a regulation that says you cannot do this and it was being done, that's gross negligence.

And, also, remember, on the part of the gross

negligence that, at least for us, we represent the Airport defendants, not the pilot. And, there's a distinction between what is gross negligence for the Airport defendants and other defendants in this case to prove. Gross negligence on the part of the Airport defendants is an entirely different matter than maybe what the pilot did, and I cited to you two cases that dealt with that issue, that what is the gross negligence with respect to the Airport defendants, because if it's a lack of regulation, which appears to be the plaintiffs' thrust and the only thing they can argue, that's not gross negligence. And, if the Court were to find that's gross negligence, that would have huge impact for --

THE COURT: Be careful. I'm not making findings here. I'm just determining whether the plaintiff has come forward with admissible evidence to demonstrate a genuine dispute about any factual issue here.

MR. MERTEN: Right, but I would suggest, your Honor, based on what the plaintiffs have said in their papers, and based on the standard that has to apply to the Airport defendants of gross negligence which is a complete and wanton disregard for safety, that even on the plaintiffs' papers as to these defendants, as to my defendants, that can't be shown because the plaintiffs own papers speak of safety steps that we took. So, we

didn't disregard it completely, and that's the standard.

THE COURT: Look, I'm not inclined to carve out pieces of this. There's nothing worse than granting motions for summary judgment partially. It leaves a mess. I think there are multiple factual questions involved, not just the question of gross negligence, and I think I've made that clear, and I'm unwilling to say I'm going to carve out this on this one and carve out that on that one.

MR. MERTEN: Two points. One is, at least with respect to this release, I think the Court should carve out, rule in a way it should say the only thing that survives here is gross negligence.

THE COURT: I'm sorry? Say that again. You went too fast.

MR. MERTEN: That if the Court is going to find that this release does not warrant summary judgment, it should carve out and leave alone gross negligence. But, I would submit, your Honor, that there's a legal argument that in Rhode Island gross negligence can be waived, and I would like to, if I could, there's a case that was cited in our papers. If I can approach, because I didn't highlight this in the papers that we filed. The Rhode Island Supreme Court actually has upheld a waiver with respect to gross negligence. It's in the DiLonardo case and I

highlighted the portion for the Court.

THE COURT: Can we back up a second? I'm looking at your papers, and I did notice as I was going through this that the motion papers didn't distinguish between the different defendants. They're all treated the same.

Your first -- you identify the defendants, and then your first section in your argument is the terms of the waiver. They're clear and unambiguous and should be applied and enforced as written. Part B, "The undisputed facts demonstrate that Costa waived her right to sue for the injuries about which she now complains." C, "The Court routinely enforces waivers that preclude recovery for parachuting accidents." And, then, finally, D, "Public policy requires enforcement of high risk sport waivers." Based on what I have in front of me, I'm not at all inclined to go through a different analysis which is taking each one of these defendants and determining whether one should be held to a gross negligence standard as opposed to an ordinary negligence standard and what the standard is given the risk. I'm just not prepared to do that. I went by the papers.

MR. MERTEN: Your Honor, two things on that. First, the motion that I filed was on behalf of Piedmont Hawthorne and Hawthorne Aviation and Rhode Island Airport Corporation.

THE COURT: Right. I have them right here. I just cited that. Do you want me to do it again?

MR. MERTEN: The other defendants filed essentially an adoption of our papers, initial papers. In the reply which we filed on behalf of the Airport defendants, we do make arguments specifically related to those Airport defendants with respect to gross negligence and with respect to the statutory duty claim that the plaintiffs raise, and those were in response to arguments that the plaintiff made. And, in those --

THE COURT: Right, but it's very, very difficult as a trial judge to work within this moving target frame work. I mean, you've framed all of your issues nicely in the motion. Everybody has signed on to those issues, and I worked from those issues. I can't tell you how frequently, when I start getting replies and sur-replies and rebuttals, that suddenly the issues move off that which was originally framed.

You know, when someone files a reply that was outside the scope of their motion papers, I assume that it's just a response as opposed to me being asked to grant summary judgment on that ground and make my conclusions having to do with each of the separate defendants, which is what you were inviting me to do a few minutes ago.

MR. MERTEN: Well, except that when we first moved, we said the basic thrust of our papers was this release is valid and should be enforced according to its terms and according to Rhode Island law. And, the plaintiffs in their objection raise a few arguments to try and undercut this release, and we've responded to those arguments. One of those is gross negligence, and I would submit with respect to our basic argument which is that this release should be put in full force and effect, regardless of their arguments that might apply across-the-board with respect to the gross negligence and the statutory claim. There might be some differences, but those differences only became relevant based upon the plaintiffs' arguments.

And, I would submit further if you look at the cases from Rhode Island that deal with waivers, they treat these waivers like any other contracts. They look to the intent. They look at the language. Can you determine the intent? And, if you can, you can enforce it unless there's a public policy problem. That's what the cases say. And, we would submit that means that the Court should enforce them.

And, to the extent there's a gross negligence argument that was made in the objection, we had submitted to the Court authorities that would suggest, that should

suggest to the Court, that that is not a valid reason for not enforcing this waiver in this context. And, in the one case --

THE COURT: Excuse me. I have your Page 6 of your reply memorandum right here. And, yes, you say plaintiffs' gross negligence arguments should not preclude entry of summary judgment as to the Airport defendants. I just didn't get from that that I was being, as you're asking me now, invited to parse this out as to each of the defendants. You know, I just --

MR. MERTEN: I think, your Honor, if you look to Page 8 of that reply, there is an argument on Page 8, going over to Page 9, that does make -- and, I understand your Honor has a lot of papers to read, but that doesn't mean that the issue isn't properly before the Court. We do make an argument that as to these defendants, if you reach the point that gross negligence is an exception to these waivers, there are reasons to treat the Airport defendants differently, because in terms of gross negligence, complete disregard of any safety, on the plaintiffs' own papers that's apparently not the case.

THE COURT: I understand your argument completely, but because I was coming at it from the perspective of the initial motion and everybody joining in it and no analysis or separate analysis by each defendant, it

seemed to me that when it comes time for a trial, all of you are going to be raising these different legal issues having to do with your individual defendants, and it very well may be that the trial justice is going to charge the jury and say, Hey, when it comes to the Airport, you can't, ladies and gentlemen, consider this question of gross negligence.

MR. MERTEN: That's if it's a fact question. What I'm submitting to you, your Honor, is this: With respect to these Airport defendants on summary judgment, it's not a fact question, and the reason it's not a fact question is apparent from papers plaintiff submitted --

THE COURT: You're missing my communication. Based on the papers that were submitted to me, the content, the form, the way they were styled, I'm not prepared today to parse this out into partial motions or partial rulings on this collective motion for summary judgment. That's all I'm saying. I didn't understand that I was being invited to treat everyone separately, although I did see this reply memorandum. I don't think the attorneys really understand that when us trial justices are confronted with a motion and we're given a framework and we start seeing the issue move, we tend to stick within the framework. I didn't feel that I was being -- I didn't see that the issue framed was -- I'm not going to try to

frame your issue for you here. As I said, it didn't come across to me that I was being asked to treat the Airport defendants separately, and because of my view of the other aspects of it, it didn't really make that much of a difference.

MR. MERTEN: I think I understand that, and I apologize if I'm not able to make it clear.

THE COURT: Now, I understood your argument.

MR. MERTEN: There's another component of the argument that doesn't apply across-the-board to the defendants, which is if the Rhode Island Supreme Court would carve out gross negligence. If I could address that, and then I think I will have worn out my welcome.

We've cited in our reply memorandum a series of cases from the Supreme Court that says Rhode Island doesn't accept degrees of negligence. Doesn't accept them. And, a couple of cases factually were similar. For example, not carving out gross negligence for Workers' Compensation claims, not giving extra compensation to employees for gross negligence which is analogous here.

THE COURT: Whoa, whoa, whoa. Why is that analogous here?

MR. MERTEN: Because on public policy grounds, the Rhode Island Supreme Court was asked to provide further

protection against gross negligence for employees, and the Supreme Court said, We don't recognize degrees of negligence. So, negligence --

THE COURT: We recognize duty and standard of care in the context of standard of care. Every day we charge juries that the higher the risk, the higher degree of care is required to be ordinary care. Every day we distinguish for juries the difference between ordinary negligence and gross negligence. The fact that in the context of the Workers' Compensation Act, the legislature decided not to extend extra protections to employees is -- does not stand for the proposition that Rhode Island doesn't recognize that there may be different degrees, levels of risk and negligence. This is news to me. I've been charging on this stuff for years and --

MR. MERTEN: We cited four cases, the Apex case, the Labree case, the Leonard case, that all say that flatly, Rhode Island law does not recognize degree of negligence.

THE COURT: All right. Let's go through them one by one. I've got the papers right here. Which ones would you like to start with?

MR. MERTEN: The Apex case is a case involving an alarm company.

THE COURT: Well, nothing is tabbed.

MR. MERTEN: I don't know that we have the cases

tabbed, your Honor.

THE COURT: How many pages into your reply memo is Apex? Here it is, yes.

MR. MERTEN: Well, there's a --

THE COURT: I have -- see, this is a 1984 case, and the plaintiff in this case had tried to allege three separate causes of action and distinguishing between negligence and gross negligence as two separate causes of action. I agree with this opinion that says we don't distinguish as far as causes of action go. Negligence is negligence. Now, the negligence might be ordinary or it might be gross, but we still recognize the concept that there are varying degrees of negligence. We just don't say one is one cause of action and another is a different cause of action. I think that's what this is saying.

MR. MERTEN: Then, your Honor, you have to go back to language of the release which talks about releasing negligence of any degree.

THE COURT: What's the next case you want me to look at?

MR. MERTEN: Well, there's -- I'll short circuit it, your Honor. The next case is the Labree case which is a guest in a motor vehicle. They all basically stand for the proposition that there's no separate cause of action for gross negligence.

THE COURT: Right, I know that, but you haven't been saying separate cause of action. You've been saying that when I charge a jury, whether I'm charging on punitive damages or anything else, I can't instruct the jury on the different degrees of care required and whether or not negligence can be ordinary versus gross.

MR. MERTEN: I want -- if I can, I want to go back to the language of the release because the release talks about releasing negligence of any degree. And, the case I've handed up to your Honor, and if you look at the Rhode Island release cases, the waiver cases, the DiLonardo case actually dealt with the issue of gross negligence. The language in the release included gross negligence, and the Court upheld that release and it said -- and, it basically is almost verbatim to plaintiffs' arguments and the argument in the case why gross negligence should be carved out. What it says is, "The trial justice --" on the last page of the case. "The trial justice apparently was concerned that general contractors, when armed with the --"

THE COURT: You really need to slow down.

MR. MERTEN: "...with the indemnity protection, would become callously reckless and willing to sacrifice people's safety in order to avoid what might be costly precautions against injury. This reasoning fails,

however, to take into consideration that fact that there is no significant distinction between the situation at bar and one in which the party has insured against his own negligence." So, the Court rejects the idea that carving that out would actually cause any kind of public policy concerns. And, that's analogous to --

THE COURT: In this case, though, they are very, very case specific in this. I mean, you're commenting or you're quoting a comment related to the trial justice's concern in that context as opposed to a general rule.

MR. MERTEN: Well, but, if you track that across the other Rhode Island waiver cases which have been cited to this Court, the language that the Court has approved is very broad. The Dudley case which the Court has, talks about disclaiming dishonest acts of the release party's employees. Ostalkiewicz talks about releasing misfeasance or malfeasance. "Malfeasance" in the Blacks Law Dictionary is evil acts. Corrente talks about waiving non-delegable duties. So, we have four Rhode Island cases, one refers to gross negligence, dishonest acts, malfeasance and non-delegable duties, and the Court has upheld all of them.

THE COURT: They all stand for different propositions. That's the problem, okay? The one that you're now pointing me to contain the words "gross

negligence" in the release.

MR. MERTEN: Right.

THE COURT: And, you had a trial justice who -- first of all, let me back up.

This case doesn't stand for the proposition that Rhode Island doesn't allow for degrees of negligence. I mean, this case does not stand for that proposition at all. In this case, the words "gross negligence" appeared in the release and the trial court justice came up with a reason to not enforce the release, and the Supreme Court said you can't do that because if somebody wants to waive something like that and they know what they're waiving, they can waive it.

MR. MERTEN: That's exactly my point, your Honor, and that's exactly in this context where the release says releasing negligence of any degree, and this is a high risk sport.

THE COURT: Right, but this takes me back to -- this is why I didn't worry about the gross negligence piece of it as to each defendant, because it still takes me back to the question of the terms of the release, the breadth of the release, what, as a matter of fact, is an activity which is associated or is a part of skydiving. And, all of that was fact driven, or at least significantly so that I can't say as a matter of law judgment should

enter.

Mr. Harten, can I hear from you on this?

MR. HARTEN: On this particular issue?

THE COURT: On any of it.

MR. HARTEN: Okay, sure.

THE COURT: By the way, all of this -- you know, these papers were very well done, and the whole issue is very interesting.

MR. HARTEN: Thank you, your Honor. I take no credit for the drafting of the papers we submitted.

To sort of go back to the beginning where we started, counsel indicated that this release does concern the activities that gave rise to Ms. Costa's injury because it's related to skydiving.

THE COURT: Well, what they're saying is if you're so dumb as to jump out of a plane, anything can happen and you better be prepared for it because you could be blown off course and run into a windmill.

MR. HARTEN: That's right, and I agree with that. But, counsel has also, in the Federal Court, filed a lawsuit indicating that, in an effort to get insurance coverage, that the injury at issue here is not related to skydiving activities, and I think the Court should be aware of that.

THE COURT: I mean, if counsel agrees with me that

this is a fact question.

MR. HARTEN: All right. There is statutory guidance that goes to the point that was being addressed earlier, and we raise that as our first argument. The Uniform Aeronautical Regulatory Act of Rhode Island and the Rhode Island General Laws requires folks engaged in operations like the defendants to not act negligently, and they can't contract that away according to Rhode Island law. You cannot waive a contractual obligation in a private agreement amongst parties like these.

THE COURT: No, you can't waive a statutory obligation.

MR. HARTEN: That's correct.

THE COURT: You said you can't waive a contractual obligation. I think you misspoke.

MR. HARTEN: By contract you can't waive a statutory obligation is what I meant to say.

THE COURT: Yeah, I think actually that body of law started evolving with the union dispute when you had management and unions trying to waive statutory rights and obligations, and there's a long history of the Court saying no can do.

MR. HARTEN: That's right. And, on this gross negligence question that you've been discussing, I draw the Court's attention to the case of Travers vs. Vaz

which indicates this is a jury question, whether gross negligence exists or not. And, secondly, this release says nothing about gross negligence at all. It says negligence of any degree, but we're talking about a contract to a lay person.

THE COURT: It doesn't matter because we're saying we don't have degrees.

MR. HARTEN: That's right. But, we are talking about a contract with a lay person whose radar might go up or antennae might go up if the defendant sought to release itself from gross negligence. But, that's not mentioned anywhere in the waiver and shouldn't be part of this discussion. It was not released under the terms of that agreement. And, there's actually a Superior Court case in which the justice wrote that persons cannot by contract absolve themselves from liability from gross negligence. So, we do have precedent in this jurisdiction on that issue.

And, finally, the case on which --

THE COURT: I think that's because of this whole public policy consideration. We do allow people to waive -- I can waive liability for your ordinary negligence. That's an intelligent thinking decision that I can make because I expect that you're not perfect and you might be negligent some day. Do we allow people to sign releases

or waive liability when your conduct is so far beyond the pale that it can be characterized as reckless or wanton? We can carry the whole thought over to the concept of punitive damages. There's an element of near criminality involved, and that's what sucks this whole public policy question back into it. Do we let people do that? And, there is a body of law that says they can't. Or, if they're going to waive gross negligence, it needs to be in the release.

MR. HARTEN: Well, I would agree with that entirely. There is some ambiguities about what is meant by the language in this release and whether it does include gross negligence. I would argue that it can't ever be waived under Rhode Island law, and I would also argue, based on the papers we submitted, this particular waiver is unenforceable even with respect to ordinary negligence. And, we've raised a number of issues submitted to the Court and I don't know if you would like to discuss any of those in particular.

THE COURT: Go ahead. Anything you want.

MR. HARTEN: Well, I started off with the statutory discussion, your Honor, indicating that the statute requires a certain level of --

THE COURT: I can't say as a matter of law it is unenforceable. I think that you know the trial is going