STATE OF RHODE ISLAND
PROVIDENCE, SC

SUPERIOR COURT

SUZANNE MARIE COSTA, CARLOS COSTA and MATTHEW COSTA by and through Suzanne Marie Costa and Carlos Costa as Guardians
Plaintiffs,

v.

DANIEL KING, BLUE SKIES SKYDIVING, INC. d/b/a Boston-Providence Skydiving Center, ROBERT SPENCER, RHODE ISLAND AIRPORT CORPORATION, INC., HAWTHORNE AVIATION – RHODE ISLAND, INC., PIEDMONT HAWTHORNE AVIATION, INC., KEVIN McCOLE AND JOHN DOES
Defendants.

v.

RHODE ISLAND AIRPORT CORPORATION, INC.
Third-Party Plaintiff

v.

NEW ENGLAND AVIATION, INC.
Third-Party Defendant

C.A. No. 05-0140

**DEFENDANT BLUE SKIES SKYDIVING, INC.'S ANSWERS TO PLAINTIFF SUZANNE COSTA'S INTERROGATORIES**

**INTERROGATORY NO. 1:**

Please state the full and correct name of the defendant's corporate entity, the date on which incorporated, the state of incorporation, the names and addresses of all officers and directors, and when the corporation was licensed to do business in the State of Rhode Island. If the corporation is no longer in existence, please also state the date on which it ceased to exist and the manner in which it ceased to exist, i.e. revocation, dissolution.

**ANSWER NO. 1**

Blue Skies Skydiving Incorporated was incorporated in Rhode Island on February 25, 1998. Robert J. Spencer was the President and sole officer/director, and his address at the time was 304 Front Street, Apt. A, Lincoln, RI 02865. The corporation is no longer in existence. A revocation certificate for failure to maintain a registered office was filed on October 22, 2001.

**INTERROGATORY NO. 2:**

Please state the full name, address, job title, and present employer of each person answering and assisting in answering these interrogatories on behalf of defendant Blue Skies.

**ANSWER NO. 2**

Robert John Spencer
40 Skydive Lane
Lebanon, Maine 04027

Independent Contractor
Pilot / Parachute Rigger
(currently working at Skydive New England in Lebanon, Maine)

**INTERROGATORY NO. 3:**

Please state the name and address of any and all Blue Skies' employees or agents present at the North Central Airport, on the date of the occurrence, including the title of each employee and their job description.

**ANSWER NO. 3**

The defendant objects to the use of the phrase "employees or agents" on the grounds that it seeks a legal conclusion and seeks to shift the burden of proof from the plaintiff to the defendant on that legal issue. Notwithstanding and without waiving these objections, the defendant answers as follows:

Robert J. Spencer was the sole employee of Blue Skies Skydiving, Inc. The following independent contractors were also present at North Central State Airport on September 29, 2002:

Daniel King, Pilot
214 Elm Street, Enfield, CT

Darren Fiske, Loadmaster
Address unknown

Chance McGuire, Instructor
Address unknown

Thomas Wilder, Instructor
Address unknown

Gary Rynbout, Instructor
Australia (address unknown)

Dawson Bruton, Office Manager
31 Glen Dr., East Greenwich, RI 02818

**INTERROGATORY NO. 4:**

Please identify all documents and tangible things in Blue Skies' possession that relate in any way to the incident, including any diary, log, chronology, calendar, appointment book or other writing. If a privilege is claimed in connection with any item, please identify those items with specificity in a privilege log.

**ANSWER NO. 4**

The defendant has and will continue to conduct a diligent search for any such documents, and will supplement this interrogatory answer to the extent required by the Rhode Island Superior Court Rules of Civil Procedure.

**INTERROGATORY NO. 5:**

State the name and address of each person having knowledge of relevant facts related to the accident which is the basis of this suit, the cause of the accident, or damages resulting from the accident.

**ANSWER NO. 5**

Please refer to Answer No. 3.

**INTERROGATORY NO. 6:**

Please state the name, address and telephone number of any and all persons who witnessed the accident.

**ANSWER NO. 6**

Please refer to Answer No. 3.

**INTERROGATORY NO. 7:**

Please describe in detail the designated skydiver landing area at the North Central Airport, as it existed at the time of the occurrence, including:

a. the dimensions;
b. the proximity to the taxiway;
c. the proximity to the runway;
d. the proximity to the boarding site; and
e. the manner in which the landing area was cordoned off

**ANSWER NO. 7**

a. Approximately 1000 feet by 250 feet.
b. The taxiway bordered the landing zone.
c. Approximately 250 feet from the boarding site.
d. The landing area was not cordoned off.

**INTERROGATORY NO. 8:**

Please identify any insurance agreement under which any insurance business may be liable to satisfy part or all of the judgment which may be entered in this action, or to indemnify or reimburse for payments made to satisfy the judgment, by stating the name of the person or entity insured, the name of the insurer, and the amount of any liability insurance coverage.

**ANSWER NO. 8**

The insurance company that sold me Blue Skies Skydiving Inc.'s insurance policy has stated that it offers no coverage for the claims being made in this case I understand that there is an ongoing lawsuit about this issue.

**INTERROGATORY NO. 9:**

Describe, in your own words, how the parachuting accident that is the basis of this suit occurred, stating specifically and in detail what the claim or contention of Blue Skies will be regarding any cause or contributing cause of the incident, including a statement of the facts or information upon which this contention is based.

**ANSWER NO. 9**

I agree with the official report of the National Transportation Safety Board, which states that the incident was caused by "[t]he parachutist's failure to obtain the proper touchdown point." The plaintiff overshot by some 200 yards the area where she had been instructed to land, and, despite being warned loudly and clearly by those on the ground right in front of her to turn away from the plane that she was headed straight for, failed to execute a simple turn or veer in any way from her collision course with the plane. The plaintiff had the skills and training to steer away from the plane, but she did not.

**INTERROGATORY NO. 10:**

Did Blue Skies conduct an investigation of this incident? If no, why not? If yes, please describe the investigation including, but not limited to, he name and address of any investigators, the steps undertaken in the investigation, conclusions drawn as a result of any investigation and all measures taken as a result of any investigation. If you are claiming a privilege as to any investigation based on it allegedly being done in anticipation of litigation, state what outward manifestations of imminent litigation you are relying on in claiming the privilege.

**ANSWER NO. 10**

No. I thought it best and most appropriate to leave the investigation to independent, unbiased authorities such as the NTSB.

**INTERROGATORY NO. 11:**

Please describe in detail the procedures employed by Blue Skies for boarding its skydiving customers onto aircraft at North Central Airport, including but not limited to the location of the plane. If these procedures changed in any way following the incident, please describe the procedures as they existed prior to, as of, and following September 29, 2002.

**ANSWER NO. 11**

Boarding procedures varied depending on the plane that was being loaded, but the boarding location was always the same. We used two planes beginning in 2000 – a smaller, piston engine Cessna, and the larger, turbine engine Cessna Caravan that we rented from Kevin McCole. Because a piston engine can tolerate repeated stopping and starting without overheating, we would shut the engine of the piston plane down between flights. However, because constant starting and stopping would damage the much hotter-running turbine engine, we would "hot load" the Caravan. These procedures reflect the accepted industry-wide practices, and we followed them before and after September 29, 2002.

**INTERROGATORY NO. 12:**

Please describe in detail the procedures employed by Blue Skies relating to ground to air communication and/or a radio operator at North Central Airport. If these procedures changed in any way following the incident, please describe the procedures as they existed prior to, as of, and following September 29, 2002.

**ANSWER NO. 12**

The pilot and the loadmaster were in constant radio communication during all flights. The pilot would notify the loadmaster when the jumpers were in the air, and the load master would monitor all parachutists during their descent, notifying the pilot when the canopies were at 5,000 feet, 3,000 feet, and 1,000 feet. Finally, the loadmaster would notify the pilot that it was "clear" when all parachutists had landed. All radio communications were transmitted over the appropriate Unicom frequency.

**INTERROGATORY NO. 13:**

If the manner in which Blue Skies' conducted operations at North Central Airport changed in any way after September 29, 2002, please identify each such change, whether such change was made at the request of any individual/entity, and to the best of your knowledge, the reason for such change.

**ANSWER NO. 13**

After our usual winter meeting with RIAC (in February or March 2003) I was told that Blue Skies would be restricted to tandem jumps for the 2003 jump season (April – October). I believe Ted Drodsz informed me of this change, and he identified the plaintiff's accident was the primary reason for the restrictions. Later in the jump season, however, we were permitted to conduct accelerated freefall classes, and jumpers who had received their training and certification with Blue Skies were allowed to jump solo.

**INTERROGATORY NO. 14:**

Please identify with specificity any and all documents pertaining in any way to the changes identified in response to Interrogatory numbered 13.

**ANSWER NO. 14**

The restrictions were reflected in the annual approval/renewal notice from RIAC in the spring of 2003. The relaxed restrictions were conveyed in an amendment to the agreement some time in July 2003.

**INTERROGATORY NO. 15:**

Please identify the date on which Blue Skies ceased conducting skydiving operations at North Central Airport, the reason for skydiving operations ceasing, and any and all documents pertaining thereto.

**ANSWER NO. 15**

Blue Skies ceased operations at the end of the 2004 jump season. We ceased operations at North Central Airport because I had identified what I believed to be a better business opportunity on Cape Cod.

**INTERROGATORY NO. 16:**

Please describe in detail any and all training Blue Skies provided to co-defendant Daniel King, in connection with piloting aircraft for skydiving purposes.

**ANSWER NO. 16**

Blue Skies did not provide any formal training to Mr. King. Linus Artman, a pilot who had previously piloted aircraft for parachuting purposes at Blue Skies, instructed Mr. King on the particulars of piloting a jump plane at North Central Airport. To the best of my knowledge, Kevin McCole hired and trained the pilots who flew the Cessna Caravan that Blue Skies rented from him.

**INTERROGATORY NO. 17:**

Please identify the dates during which Blue Skies employed co-defendant Daniel King, and describe the manner in which Blue Skies compensated Mr. King.

**ANSWER NO. 17**

Daniel King was not an employee of Blue Skies; he was an independent contractor who received a flat fee of $200 per day.

**INTERROGATORY NO. 18:**

Please identify the dates during which Blue Skies rented any aircraft from co-defendant Kevin McCole, identify the aircraft, and describe the manner in which Blue Skies compensated Mr. McCole for use of the aircraft.

**ANSWER NO. 18**

Blue Skies rented a Cessna Caravan for the jump seasons (April – October) of 2000 through 2003. The arrangement was a "dry lease," meaning that Blue Skies paid the pilot and paid for the fuel it used. Blue Skies also paid Kevin McCole on a per seat basis for each flight. Blue Skies paid Kevin McCole $15 per flight for every experienced jumper on board, and $40 for each tandem pair on board ($20 for the customer, $20 for the instructor). Any payments to Daniel King from Blue Skies for piloting the Cessna Caravan were deducted from the amount Blue Skies paid to Kevin McCole for that accounting period, pursuant to the agreement between Blue Skies and Kevin McCole.

**INTERROGATORY NO. 19:**

Please identify any and all reports of this incident you are aware exist. This shall include, but not be limited to, any and all reports prepared by Blue Skies or any of the other defendants in this action, any municipal, state or federal agencies, or any municipal, state or federal rescue personnel.

**ANSWER NO. 19**

I am aware of the NTSB report and RIAC's investigation, which included a standard incident report that I filled out on behalf of Blue Skies whenever there was any type of injury to a skydiver or irregular occurrence. The Rhode Island State Police also responded to the incident, but I do not know if they made any official report.

**INTERROGATORY NO. 20:**

Please describe in detail any and all skydiving incidents or accidents resulting in death, personal injury, or property damage, occurring at North Central Airport, during the time period in which Blue Skies was operating at the airport.

**ANSWER NO. 20**

Defendant objects to this interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving these objections, the defendant states:

No accidents resulting in death, but some parachutists did suffer sprains, fractures or broken bones on occasion, as is typical with skydiving.

**INTERROGATORY NO. 21:**

Please state the name and address of any advertising firm, agency, or person which Blue Skies hired to advertise its services in the five years prior to September 29, 2002.

**ANSWER NO. 21**

Defendant objects to this interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving this objection, the defendant states:

None. Blue Skies would sometimes advertise in the Boston and Providence *Phoenix* newspapers, but we would simply provide a photo and text and the newspaper would handle the layout. We also advertised on Providence radio stations (93.3 FM, 95.5 FM) but those ads were also produced by the radio stations themselves.

**INTERROGATORY NO. 22:**

If Blue Skies has entered into or reached any type of settlement agreement with any person or entity (whether a party to this lawsuit or not) regarding the incident made the basis of this lawsuit, please identify all parties to said settlement agreement and the terms and conditions of such agreement.

**ANSWER NO. 22**

The defendant objects to this interrogatory to the extent that it seeks confidential settlement information and is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving these objections, the defendant states:

None.

**INTERROGATORY NO. 23:**

Please identify each and every individual who you intend to call as an expert witness in this matter. This shall include the name and current address of each expert, a statement of the subject matter on which the expert is expected to testify, a statement of the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

**ANSWER NO. 23**

My attorneys have advised me that no decision has been made as to any expert witnesses who may be called to testify at trial. This answer will be supplemented to the extent required by Rule 26 of the Rhode Island Superior Court Rules of Civil Procedure and/or by any Order of this Court.

**INTERROGATORY NO. 24:**

Please identify each person whom you expect to call as a witness at the trial in this matter. This shall include the witnesses' name, current home and business address, occupation, a statement of the subject matter on which the witness is expected to testify, and a brief summary of the expected testimony.

**ANSWER NO. 24**

The defendant objects to this interrogatory on the grounds that it exceeds the scope of discovery permitted by Rule 26 of the Rhode Island Superior Court Rules of Civil Procedure and/or by any Order of this Court.

**INTERROGATORY NO. 25:**

Identify by date and subject matter, each and every photograph, motion picture, videograph, pictorial or graphic representation, electronic voice recording or the like, describing or depicting the parties, objects, events or circumstances of the incident identified in the Complaint.

**ANSWER NO. 25**

The defendant objects to this interrogatory to the extent that it seeks information concerning attorney work product materials that may be created in preparation for the trial on this action. Notwithstanding and without waiving this objection, the defendant states as follows:

None.

**INTERROGATORY NO. 26:**

Please describe Blue Skies' business relationship with each of the named co-defendants, as it existed on September 29, 2002. If there was a contract or other document memorializing the terms of this relationship, please identify this document with particularity.

**ANSWER NO. 26**

Blue Skies rented a Cessna Caravan from Kevin McCole and paid Daniel King to pilot that aircraft as an independent contractor pursuant to the arrangement described in Answer No. 18, above. Blue Skies paid Hawthorne Aviation-Rhode Island rent for the right to use the landing area. Blue Skies paid New England Aviation rent to sub-let a tie-down area and space on which to place a trailer/office. Rhode Island Airport Corporation owned North Central Airport, so it determined whether and on what terms Blue Skies was able to conduct skydiving operations.

**INTERROGATORY NO. 27:**

Has Blue Skies ever conducted any test, experiment or accident re-creation reconstruction from which, or the results of which, you will attempt to introduce into evidence in a trial of this case?

**ANSWER NO. 27**

Defendant objects to this interrogatory to the extent that it seeks information prepared in anticipation of litigation or for trial and information protected by the work product doctrine under the Rhode Island Superior Court Rules of Civil Procedure. Notwithstanding and without waiving these objections, the defendant states:

No.

**INTERROGATORY NO. 28:**

If Blue Skies has ever been cited for failure to conform to any governmental statute, ordinance, regulation, rule or guideline, please identify the agency issuing the citation, the date of the citation, the date of the occurrence giving rise to the citation, the location of the occurrence, and a general description of the occurrence.

**ANSWER NO. 28**

Defendant objects to this interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving these objections, the defendant states:

Blue Skies has never been cited for any such reasons.

**INTERROGATORY NO. 29:**

Do you contend that the plaintiff has exaggerated any complaint, symptom or impairment in connection with the injuries alleged to have been sustained in this incident?

**ANSWER NO. 29**

I have not seen the plaintiff since her accident, so I personally have no basis to determine whether she has exaggerated any complaint, symptom or impairment in connection with the injuries alleged to have been sustained in this incident. On the advice of my attorneys, I reserve the right to retain and call at trial any medical or other experts needed to pursue my defense, including experts who may comment on Mrs. Costa's damages claims and/or medical condition before and after the accident.

**INTERROGATORY NO. 30:**

Please identify each document you reviewed in connection with answering these interrogatories, by stating its title or a description of each document by subject matter, date and author.

**ANSWER NO. 30**

The defendant objects to this interrogatory on the grounds that it is unduly burdensome, not reasonably calculated to the to the discovery of admissible evidence and otherwise beyond the scope of discovery permitted by Rule 26 of the Rhode Island Superior Court Rules of Civil Procedure.

***SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, THIS 26 DAY OF AUGUST, 2008.***

Spencer
Robert Spencer

As to Objections:

Francis A. Connor, III
R.I. Bar No. 4640
Timothy J. Groves
R.I. Bar No. 7596
TAYLOR, DUANE, BARTON & GILMAN, LLP
10 Dorrance Street, Suite 700
Providence, RI 02903

401.273.7171
401.273.2904 – Fax

**CERTIFICATE OF SERVICE**

I, Francis A. Connor, III, hereby certify that on August 27, 2008, I served a true and accurate copy of the following:

1. Defendant Blue Skies Skydiving, Inc.'s Answers to Plaintiff, Suzanne Costa's Interrogatories.

Steven P. Harten
Ratcliffe Burke Harten & Elias LLP
1600 Financial Plaza
Providence, RI 02903

David D. Bagus, Esq.
Bagus & Beagan, LLC
176 Eddie Dowling Highway, Suite 202
North Smithfield, RI 02896

Howard A. Merten, Esq.
James A. Ryan, Esq.
180 South Main Street
Providence, RI 02903

Dennis Carley, Esq.
Robert Carroll Feldstein & Pierce Inc.
Ten Weybosset Street
Providence, RI 02903

David P.Whitman, Esq.
Hanson Curran
146 Westminster Street
Providence, RI 02903

David N. Zeehandelaar, Esq.
Lev Kalman, Esq.
Blank Rome
One Logan Square
Philadelphia, PA 19103

Timothy J. Groves.