to what kind of coverage was provided by the Lloyd's of London company policy?
A. In general terms, but I'm sure it specifically excludes skydivers.
Q. Other than your attorneys, has somebody told you that this policy specifically excludes skydivers?
A. My insurance agent has, and I've read the policy.
Q. When you purchased this policy, did you understand it to specifically exclude skydivers?
A. Yes.
Q. You've been in this business of providing planes to skydiving operations for quite some time, correct?
A. Yes.
Q. Have you ever held an insurance policy that did not specifically exclude claims by skydivers?
A. No.
Q. You were not present on the date of this incident, correct?
A. Correct.
Q. Did you travel to North Central State Airport following the incident?
A. Yes.
Q. Did you travel there on September 29th?

Q. Did they have to be repaired or replaced?
A. Removed.
Q. They were not replaced?
A. No.
Q. Did any insurance company cover the cost of removing those parts?
A. No.
Q. Was any insurance claim submitted to try and replace those parts?
A. No.
Q. Prior to renting your plane to Robbie Spencer for skydive operations, did you make any inquiry of him of any insurances he maintained regarding his skydiving operations?
A. No.
Q. Is there any reason you don't make such an inquiry of Mr. Spencer, or you didn't make an inquiry of Mr. Spencer?
A. I know there's no specific policy available for skydiving.
Q. You know there is no specific policy available to him or in general?
A. To him, or in general, I believe.
Q. How is it that you know that?
A. Because our industry has been in that

situation since I've been in the industry.
Q. Was there ever a time where you attempted to get such a policy and were denied?
A. No.
Q. Did you speak with anyone at North Central State Airport regarding the Suzanne Costa incident when you went there after her accident?
A. I'm sure that I did.
Q. Do you have any recollection regarding who you spoke with?
A. No.
Q. Do you have any recollection of the substance of any conversations you had with anybody?
A. Let me change that. I think when I went to the airport, there was nobody there. So, I don't think I spoke to anybody at the airport about the accident.
Q. Other than people at the accident, do you recall speaking to anybody else about this accident?
A. I've spoke to 100 people about this accident.
Q. Did you speak with Mr. King?
A. Yes.
Q. Let's say in the week following this accident, did you speak with Mr. King?
A. I spoke to him on the 29th.

Corporation. Let me first talk about the insurance subject. You've told us that as of September 29, 2002 you did have liability insurance, correct?

A. Yes.

Q. It was issued in your own personal name?

A. Yes.

Q. That would have covered, among other things, the Caravan at issue in this case?

A. Yes.

Q. And it included liability coverage, as a general topic, correct?

A. Yes.

Q. Do you know how much liability it was?

A. One million.

Q. One million per occurrence?

A. That sounds right.

Q. And it's your understanding that there was an exclusion within that $1 million liability coverage for skydiving activities?

A. Yes.

Q. Did you have any written communication -- strike that. Did you have any communication, written or otherwise, with your insurance company or anyone acting on behalf of the insurance company

following the Suzanne Costa incident?
A. Yes, I did discuss it with my insurance agent.
Q. Who is that?
A. Jeff Norris.
Q. What is the name of the agency?
A. AIR, Aircraft Insurance Representatives.
Q. They're located where?
A. In Georgia, Atlanta -- Gainesville, Georgia.
Q. As best you know, are they still there?
A. Yes.
Q. Are they still your broker?
A. Yes.
Q. And you and Mr. Norris had a verbal conversation or written communication or both?
A. Verbal.
Q. Was this one conversation or more than one?
A. At least one, I'm not sure.
Q. Was this shortly after the incident occurred?
A. Yes.
Q. And just the substance of what you said to him, what he said to you was what?
A. I described the situation and he agreed that it was not covered by anything we had.
Q. He agreed that it was not covered, or he advised

you it was not covered?
A. He advised me.
Q. Other than that verbal exchange, has there been any further contact between you and either the insurer or your broker or anyone acting on behalf of the insurer concerning the possibility that there is some coverage available to you for this incident?
A. No.
Q. That's it, just that one verbal exchange, or it could been more than one call?
A. Yes.
Q. Within a relatively short period of time, right after the incident, nothing in writing, that was it?
A. Yes.
Q. Do you still have a copy of your policy that would have been in effect on September 29, 2002?
A. I think I do. I'm not sure.
Q. Is there any reason why you couldn't provide that to your counsel?
A. No.
Q. It's not lost in some flood somewhere or under two tons of trash, or anything like that?
A. Not that I'm aware of. I'm not exactly sure

where it is at this second.
Q. Indeed, you still deal with AIR?
A. Yes.
Q. Do you have any reason to suspect that they don't still have copies of your '02 policy as well, if we needed to get it from them?
A. I have no reason to suspect that.
Q. What amount of liability insurance coverage do you carry now?
A. One million.
Q. Still one million. What was your understanding -- what is your understanding as of the '02 policy for purposes of liability that you were insured for, if you didn't think you were insured for skydiving operations?
A. It would provide coverage if the airplane was damaged, and it would cover liability if the airplane landed on a highway or a house or, you know, that kind of liability.
Q. I take it there's been no legal proceedings between you and the insurance company as to whether there is or isn't coverage provided to you in this case?
A. No.
Q. Do you know who the lead underwriter was from

current policy and try to work backwards?
A. Yes.
Q. Changing gears for a minute. The arrangement you had with Blue Skies, did you and Mr. Spencer discuss the subject of which one of you or both, or neither, would provide liability insurance coverage in case a jumper got injured?
A. No.
Q. Never came up?
A. No.
Q. Was it your expectation or understanding that Blue Skies had coverage for itself for liability?
A. No.
Q. You didn't think that?
A. Not specifically for skydiving.
Q. Okay. And you say that because you don't think anyone in your industry has that kind of coverage?
A. Correct.
Q. How did you come by that knowledge, by the way? Strike that. How did you come by that belief?
A. I think from being in the same industry for 20 years and discussing it with my insurance agents.
Q. Have you ever discussed it with anyone other than the AIR aircraft group in Georgia?

A. Yes.
Q. Who else have you discussed that topic with?
A. Other aircraft operators, skydiving center owners, other insurance representatives.
Q. Are you a member of the USPA?
A. Yes.
Q. Do you know if the USPA has any type of insurance program that it either sponsors or through its auspices?
THE WITNESS: For?
MR. ZEEHANDELAAR: For skydiving.
A. Aircraft liability for skydiving, no. They do not have that product.
Q. How long have you been a member of the USPA?
A. On and off since 1980.
Q. And indeed, you have been in this industry on and off since 1980, right?
A. 1980 I started jumping; 1987 I started buying planes and operating a skydiving center.
Q. Right now you would call this your profession?
A. Yes.
Q. In fact, you said you've flown yourself over 4,000 skydiving missions, you've yourself taken 50 to 100 jumps that was just at North Central, right?
A. Yes.

propellers running?

A. Yes.

Q. Based upon your knowledge and experience in the industry, is it unusual for jumpers to sign a waiver of liability or release of liability prior to jumping?

A. No.

Q. On the contrary, is that very common?

A. Yes.

MR. ZABBO: Objection.

Q. In fact, have you ever heard of a jump center anywhere that does not require such a waiver and release to be signed by a jumper?

A. No.

Q. Do you know why that is?

MR. ZABBO: Objection.

MR. ZEEHANDELAAR: If you know. If you don't, you don't.

A. Most people want -- most people in this business expect the waiver as a matter of doing business because the liability insurance isn't there, and also because it's a high-risk activity.

Q. Have you come by any information from any source at all at any point in time that Ms. Costa either didn't understand or failed to appreciate the